**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
---------------------------------------------------------X
BETSY BENEDITH, SHERWYN BESSON,
and KENNETH SMITH,

                    Plaintiffs,              **MEMORANDUM OF**
                                                  **DECISION AND ORDER**
            -against-                 11-cv-5964 (ADS)(GRB)

MALVERNE UNION FREE SCHOOL
DISTRICT, JAMES BROWN, JAMES
HUNDERFUND, ROSALINDA RICCA, and
VINCENT ROMANO

                    Defendants.
---------------------------------------------------------X

**APPEARANCES:**

**The Law Offices of Steven A. Morelli, P.C.**
*Attorneys for the Plaintiffs*
1461 Franklin Ave.
Garden City, NY 11530
      By: Steven A. Morelli, Esq.
           Paul Bartels, Esq., Of Counsel

**Sokoloff Stern LLP**
*Attorneys for the Defendant*
179 Westbury Avenue
Carle Place, NY 11514
      By:    Brian S. Sokoloff, Esq.
             Melissa L. Holtzer, Esq., Of Counsel

**SPATT, District Judge.**

On December 7, 2011, the Plaintiffs Betsy Benedith, Sherwyn Besson, and Kenneth

Smith (collectively the "Plaintiffs"), current and former employees of the Malverne Union Free

School District (the "District"), commenced this action against the District, James Brown

("Brown"), James Hunderfund ("Hunderfund"), Rosalinda Ricca ("Ricca"), and Vincent

Romano ("Romano") pursuant to 42 U.S.C. § 1981, 42 U.S.C. § 1983, the Equal Protection

Clause of the Fourteenth Amendment to the United States Constitution, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the New York State Human Rights Law ("NYSHRL"), and the Nassau County Human Rights Law ("NCHRL"), raising claims for, among other things, employment-related discrimination and a hostile work environment on the basis of race.

On January 31, 2014, the Defendants filed a single notice of motion pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56 for summary judgment dismissing the complaint in its entirety as to each Plaintiff. Alternatively, the Defendants moved pursuant to Fed. R. Civ. P. 21 and/or 42(b) for severance of the claims and to hold separate trials. With the Court's permission, the Defendants filed a separate memorandum of law as to each Plaintiff.

For the reasons set forth, the motions for summary judgment are granted in part and denied in part. The alternative motions for severance and separate trials are granted.

## I.      BACKGROUND

Unless stated otherwise, the following facts are drawn from the parties' respective 56.1 statements and the exhibits attached. Triable issues of fact are noted.

A. Facts Relevant to All Plaintiffs

1.      The District's Anti-Discrimination Policy

The District has an anti-discrimination policy, which provides that employees should make any complaint of discrimination to the District's Title IX officer or they may follow the procedures in place for filing a grievance under the collective bargaining agreement negotiated between the Malverne Teachers' Association and the Board of Education. The anti-discrimination policy provides for two procedural stages and one appellate stage for any investigation into a discrimination complaint.

Romano, who is white and was at all relevant times the Assistant Principal of the Middle School, confirmed in his deposition that (1) he did not know if the District had such a policy and (2) he had received no training regarding anti-discrimination sensitivity.

Hunderfund, the District's Superintendent, who is also white, had not reviewed the anti-discrimination policy in the three years prior to his deposition, which was taken on March 8, 2013. As to Ricca, the Chairperson of the District's Math Department, he indicated that he did not know if the District had an anti-discrimination policy.

B. Facts as to the Plaintiff Betsy Benedith

1. Benedith's Service as Dean of Students of the Middle School

In 2007, Benedith, who is black, was hired by the District as the Dean of Students in the Howard T. Herber Middle School (the "Middle School"). Romano and Hunderfund were a part of the hiring committee that was involved in Benedith's hiring.

Steven Gilhuley, who is white and was the Middle School's Principal, supervised Benedith when she was the Dean. Gilhuley gave Benedith favorable performance evaluations during the time she spent at the Middle School. In this regard, Gilhuley found Benedith to be "effective with her management and interaction with the staff," and commented that "[s]he did a good job." (Gilhuley Dep., at 39.) That said, Benedith felt that Gilhuley excluded her from certain conferences on the basis of her race, but she never reported this belief to anyone.

2. Benedith's Promotion to Assistant Principal of the High School

At some point, Hunderfund and Richard Banyon, the District's Deputy Superintendent, encouraged Benedith to apply for the Assistant Principal position in the High School, which she did. Theadra McCrae, the District's Pupil Personnel Supervisor, Ricca, and Brown, the High School Principal, who is black, interviewed Benedith for the Assistant Principal position.

Hunderfund recommended Benedith's appointment as Assistant Principal in the High School to the District's Board of Education. In 2008, the Board of Education approved Benedith's appointment.

As Assistant Principal, Benedith observed teachers and planned assemblies, award ceremonies, parent-teacher conferences, and staff development. During this period, Brown was Benedith's direct supervisor.

At the High School, the other Assistant Principal position was later filled by Romano.

Benedith alleges that although she was promoted to Assistant Principal at the High School before Romano was so promoted, Romano was given seniority credits over Benedith. However, it appears Romano had more seniority because he previously held the position of Assistant Principal in the Middle School.

Further, Benedith alleges that while both Assistant Principal positions in the High School were supposed to be equal in rank, in fact, such was not the case. In this regard, Benedith maintains that Brown unfairly preferred Romano over her. For example, Brown gave Benedith an office on a different floor from his and Romano's office. By contrast, Brown and Romano's offices are both on the second floor, less than a hundred yards apart.

Benedith testified that, when discussing assignments and seniority in July 2008, Brown told her: "I just need you to know that if you notice that I show preference to Mr. Romano, don't take it personal. You know, we are in a White District. They are in control. They are prepping him to become the Principal and I don't want to give the staff members an impression that I am favoring you over him because you're Black." (Benedith Dep, at 85.)

In a memorandum from Benedith to Brown, dated March 8, 2011, Benedith wrote: "During the course of the work/school day, it may become challenging to remain in constant

communication especially if I am not on the same floor." (Benedith's Exh. E.)  Benedith

continued: "I realize that being on a different floor from the main/principal's, attendance,

assistant principals, and guidance office, does not allow me the opportunity to give

input/feedback, receive pertinent information, and/or be part of the decision making that would

make me a stronger administrator and allow me to be considered a part of the administrative

team." (Id.).

Brown admitted that Benedith "may have" expressed to him that her room assignment

created communication issues. (Brown Dep., at 58-59.)  Brown testified that he too was

concerned about the communication issues resulting from the office assignments, and that he

even "expressed it to her" himself.  Brown also admitted that "Romano and my office have a

close proximity, so [we] naturally had an opportunity to see each other." (Id.)

In addition, Romano initially had a full-time secretary, while Benedith only had two part-

time secretaries.  Benedith's secretaries split the day in half, apparently resulting in missed

messages and problems processing paperwork.  Benedith complained about this to Brown.

Following this complaint, the District assigned Benedith a full-time secretary.  However,

Benedith did not have a full time secretary as Assistant Principal for two years, until 2010.

Benedith also alleges disparate treatment between Romano and her in other aspects of

work.  For example, each of the District's schools takes turns organizing a Martin Luther King

Day Event.  Benedith organized the event in February 2009, when it was the High School's turn.

However, two or three hours before the event, Hunderfund disapproved the program pamphlet

created by Benedith.  The pamphlet had previously been approved by Brown.  As a result,

Benedith paid for the banner, the construction paper, markers, and miscellaneous supplies out of

her pocket.  Instead of finding out why Hunderfund did not approve the pamphlet, Benedith

admitted that she simply "changed the color to make it appear as if I changed something" and made new copies. (Benedith's Dep, at 230-31.) Ultimately, Benedith did not receive a letter of commendation in her personnel file for her efforts organizing the Martin Luther King Day event.

By contrast, Romano received approximately $1,000 from the District for his project; the college fair. The District has paid for Romano's college fair every year he has held it. Romano received a letter of commendation in his personnel file for his efforts organizing the college fair.

Benedith also alleges that Romano undermined her authority in certain regards. For instance, although Romano did not have the authority to discipline Benedith, in June 2010, Romano reprimanded Benedith in front of other teachers regarding a directive she gave them during a state examination. Romano allegedly reprimanded Benedith while on speakerphone, in the presence of two or three social studies teachers, who were all white. Benedith believes that Romano was discriminating against her on the basis of her race when he chided her in front of their white colleagues. Benedith allegedly reported this incident to Brown.

In October 2010, Benedith was in charge of administering a PSAT examination at the High School. On the day of the examination, Brown and Romano attempted to contact Benedith with questions about the examination; however, they could not reach her. Benedith maintains that she did not receive any calls from either Brown or Romano.

Benedith also admitted that she was absent on the day of a Regents examination and that her secretary did not know what to do in Benedith's absence. Benedith's secretary did not know what to do because Benedith did not give her any instructions prior to her absence. Benedith acknowledged that an administrator and two other people are supposed to be present to count Regents examinations on the day of the test. Benedith had no idea what happened in her absence, although this was her responsibility.

According to Benedith, in her absence, the Principal was responsible for the administration of examinations.  Benedith maintains that, even if Benedith had provided her secretary with instructions in her absence, the secretary could not have given directives to chairpersons as to the administration of the test, as this responsibility ultimately fell to Brown.

    3.  <u>The Alleged Hostile Work Environment Against Benedith</u>

Benedith asserts that, as the Assistant Principal at the High School, she was subjected to a hostile work environment – primarily, created by Brown – on account of her race, even though the two individuals were both black.

For instance, Benedith attended at least 10 professional development courses during her employment with the District, including courses on administrative leadership and constructing a master schedule.  According to Benedith, Brown verbally denied many of Benedith's requests to attend professional development conferences before she even had a chance to fill out written request slips.  Benedith believed Brown denied her requests based on her race.  Benedith felt this way, in part, because when she approached Brown, he would say, "No. Don't go with your head' You know, moving – making the head gestures.  You know circular motions just remind[] me that I'm from the ghetto." (Benedith Dep, at 203.)  Brown also commented to Benedith, "Y'all know you got attitude when y'all from the project." (<u>Id.</u>)

There is also evidence that Brown called Benedith a "nigger" to her face regularly from 2008 to 2011.  On July 7, 2008, Brown allegedly commented to Benedith when he told her that she "was a black woman, [she] wasn't going to be liked and at the end of the day, [she] is still [a nigger]." (<u>Id.</u> at 266.)  Brown also told Benedith "you are Black, you are a woman, you are smart and you are beautiful, and they (White staff members) are not going to like you because of that, and at the end of the day, they are going to look out for each other and at the end of the day, you

are always going to be a nigger, and when you wake up in the morning, you are always going to be Black." (Id. at 279.)  Between 2008 and 2011, Brown would often also remind Benedith that she "can do whatever [she] wants, it doesn't matter how good it is, but you [can't] change who you are, referring to her race." (Id. at 280.)

Another instance occurred on November 2, 2010, after Brown and Benedith were involved in a verbal altercation with certain white administrators, including Romano.  During the incident, Romano asked Brown if he knew how to spell a certain word, to which Brown responded: "I am not going to stoop down to your level." (Id. at 167.)  Following this comment to Romano, Brown and Benedith apparently walked to Browns' office where Brown told Benedith:  "This is what I am talking about.  At the end of the day, you're always going to be the [nigger].  It's the all White boys club and that's all they see when they look at you." (Id. at 127.)

In April 2011, Brown allegedly told Benedith: "Don't come in here complaining like these other [bitches].  Don't come here with your head – the head shaking like you know you ghetto girls do – the girls from the ghetto do." (Id. at 172.)  Brown said this to Benedith "whenever I would go in and say something." (Id.)  However, Benedith told no one at the District that she felt Brown was discriminating against her on the basis of race.

At Brown's deposition, he stated: "All Blacks suspect racism . . .  racism is always suspected with us whenever it involves someone white or whatever. Some are more vociferous about it than others, but it does exist.  I am sure you will agree.  And we often talk about it amongst ourselves."  Brown further testified that, in the United States, "white folks" are the "dominants" and in power, while Blacks are "not in the power position." (Brown Dep., at 45-46.)

4. <u>The Denial of Tenure for Benedith and Her Termination from Employment</u>

In November 2010, Brown told Benedith that the District was considering eliminating her position for budgetary reasons. Conversely, Benedith alleges that the position was eliminated because she is black, as the remaining non-black Administrators received tenure and their positions were not eliminated. Banyon, the Deputy Superintendent, confirmed that, as a result of these personnel decisions, ten of the eleven District Administrators are white, as are all members of the Central Administration. Benedith also notes that minorities compose 15% of the total certified staff at the District, including teachers and administrators, at the District.

Brown did not recommend Benedith for tenure. Brown indicated in a March 2011 Mid-Year Performance review that while Benedith was popular with her students, he "would like to have seen more professional growth in leadership over the past two years." (Benedith's Exh. M) However, Benedith notes that Brown did not evaluate her in 2009-2010 and only evaluated her in 2011 "because she was up for tenure" (Brown Dep., at 56.); Romano did not receive an evaluation in the 2011-2012 school year; Romano received tenure as an Assistant Principal at the conclusion of the 2009-2010 school year; and Romano did not receive a mid-year evaluation during the year he received tenure.

On March 25, 2011, Banyon gave Benedith a letter which stated that she would not be receiving tenure. This letter advised her that Benedith's probationary period would end on June 24, 2011. Also, by letter dated March 25, 2011, Hunderfund notified Benedith in writing that, at the upcoming May 10, 2011 Board of Education meeting, he would be recommending that she not be granted tenure.

Benedith, along with her union representative, McRae, requested a reason for her termination and a meeting with Hunderfund regarding the same. The Defendants contend that, at

the meeting, Hunderfund offered to ask the Board to grant Benedith tenure if she submitted an irrevocable letter of resignation. Benedith, on the other hand, maintains that Hunderfund only offered to ask the Board to grant Benedith tenure if there were no community protests at the Board meeting. McCrae told Benedith to "give them their letter and they will grant you tenure." (Benedith's Dep, at 401.) Benedith claims that she did not provide a letter of resignation because it would have disqualified her from unemployment benefits.

Benedith did not ask to make her case for tenure to the Board. Benedith was never advised by her union representative that she was entitled to make a case for tenure before the Board. In addition, Benedith did not look into whether she could have requested a fourth probationary year in lieu of termination. Rather, Benedith asserts that she was not aware that she could request a fourth probationary year.

On May 10, 2011, the Board of Education voted to terminate Benedith's employment. Benedith notes that Hunderfund recommended that the Board terminate Benedith's employment; that the Board "rubber stamps" Hunderfund's decisions regarding the "hiring and firing of persons;" (Hunderfund Dep, at 186.) and that Hunderfund's recommendation was based in part upon Brown's recommendation that Benedith's employment be terminated.

On May 18, 2011, Hunderfund notified Benedith in writing that the Board of Education had accepted his recommendation.

After Benedith's termination, her job duties as Assistant Principal were assumed by an individual with the surname Benfante, who is white. Benfante worked in Benedith's old office, and performed her former responsibilities such as: (1) keeping attendance for grade levels; (2) keeping track of cuts; (3) proctor scheduling; (4) planning honor roll celebrations; and (5) administering parking permits.

After Brown learned of Benedith's termination in June 2011, Brown recommended that Benedith apply for positions in Roslyn, Freeport, Roosevelt, and commented with respect to the Roslyn position, "That will probably be a good fit for you because there is a little – there is a section where they have minorities … so you should apply." (Benedith's Dep., at 221.)

C. Facts as to the Plaintiff Sherwyn Besson

From September 2004 to the present, Besson, who is black, has been employed as a teacher in the Business Department of the High School. During the 2005-06 school year, he acquired tenure status. Besson is the father of two minor children, daughter A.B. and son I.B., who at various times have been students in the District.

1. Alleged Discrimination Against Besson by Kathy Varol

Besson alleges that Kathy Varol, the head of the District's Business Department, discriminated against him by questioning him about his students' passing percentages from 2006 to 2010. On the other hand, Besson alleges that Varol did not press white teachers about their students' passing percentages. Besson acknowledges that these white teachers had students with higher passing percentages than the Besson students. However, according to Besson, in the District, black teachers felt more pressure to pass students than did white teachers.

Varol assigned teachers the following ratings based on their performance: Unsatisfactory (lowest), Satisfactory, Good, Very Good, and Excellent. According to Besson, Varol showed him a chart that reflected the observation ratings that she gave to all of the District's business teachers. According to this chart, two white teachers received "U" unsatisfactory ratings. Varol never gave Besson a "U" rating. However, Besson alleges that his ratings have remained the same at "good" throughout his tenure at the District, falsely implying no improvement, while his white colleagues' scores have stayed consistently at "very good." (Defs' Exh. U.)

Besson concedes that Varol never made any comments to Besson about his race.

2.  Alleged Discrimination Against Besson Regarding Administrative Duty

Within the District, all teachers are required to perform some kind of administrative duty. This administrative duty can be hall duty or supervising a study hall class. Some teachers have alternative duties, like chairing committees, helping to enforce District policies, or accepting lead teacher assignments. A chairperson typically requests that a teacher be relieved of an administrative duty so that the teacher could assist with these other tasks. However, Besson alleges that Romano makes the final decision as to which teachers are exempt from administrative duty.

No chairperson or administrator ever contacted Romano and requested that Besson be relieved of his administrative duty. For example, when Rachel Ruisi, who is white, was performing administrative duties enforcing the eligibility policy, she was spared from the administrative duty list. In the 2009-2010 school year, when Besson was performing similar duties enforcing the eligibility policy, he remained on the administrative duty list.

Besson asserts that white teachers are not always required to perform these administrative duties. Besson further contends that black teachers had more students in their study hall classes than did white teachers. Besson complained to his union about this allegedly discriminatory administrative assignment schedule.

3.  Alleged Discrimination Against Besson As the Soccer Coach

Besson was also the coach of the District's Varsity Soccer team from 2005 to 2009 or 2010. The Board of Education and the Malverne Teachers' Association set the coaches' stipends. However, Besson claims that Hunderfund has input as to personnel salaries. During his tenure as boys' soccer coach until 2010, Besson alleges that he was paid less than white

coaches, such as Kim Rossi who coached volleyball, which Besson asserts is much a "less demanding" sport than boys' soccer. (Rule 56.1 Statement, at ¶ 33.2) The Defendants note that the coaches' stipends are fixed in the collective bargaining agreement.

If Besson needed funds for his team, the protocol was for him to request it from the District's Athletic Director and Business Manager. When Besson was the soccer coach, Brenda White was the Athletic Director and Ray Neblitt was the Business Manager, both black. However, Hunderfund confirmed that the Athletic Director reports to Brown, who has the authority to "veto" and deny requests for funds from the Athletic Director.

During the 2008-2009 and 2009-2010 school years, Besson spent $2,000 out of his pocket on uniforms for his soccer team. Prior to purchasing the uniforms, he requested new uniforms from the Athletic Director, but was told there were no funds available. Hunderfund testified that he did not believe that it was appropriate that Besson paid for the uniforms, and is not aware of any other coaches who have paid for their team's uniforms.

4.  The Alleged Retaliation Against Besson for His Decision to Send His Daughter, A.B., to Private School

At the end of the 2007-2008 school year, A.B. was the 8th grade Valedictorian at the Middle School. Hunderfund and Brown repeatedly recommended to Besson that he enroll A.B. at the High School. According to Besson, on one occasion, Hunderfund's body language suggested that he was trying to intimidate Besson into sending A.B. to the High School. Besson further asserts that when he made it clear to Hunderfund that he would not be sending his daughter to the High School, but rather to a private Lutheran High School located within the District, Hunderfund was not happy with his answer.

During the 2008-2009 school year, A.B. had access to District-funded school busing to the Lutheran High School. On July 14, 2009, Besson applied for busing for the 2009-10 school

year. The deadline to apply expired on April 1, 2009. In August 2009, Besson received

notification that his request was untimely, and, therefore, transportation would not be provided to

A.B.

However, Besson alleges that he is aware of other students whose applications were sent

later, as late as August 2009, yet still secured public busing to their private schools that year. In

particular, Besson alleges that another student, Nicole Zimmerman, who is white, submitted a

late transportation application to the District, but the District nevertheless provided her with

transportation.

As a result of the denied application, Besson was forced to drive his daughter to and from

the Lutheran High School, requiring the forfeiture of his position as the boys' soccer coach.

Besson allegedly lost $5,000 in income as a result of his forfeiture of the boys' soccer coach

position, and was subsequently unable to obtain another paying extra-curricular activity. Besson

appealed the District's decision to the New York State Education Department. The New York

State Education Department found in the District's favor.

5. The Alleged Retaliation for Publicly Criticizing Hunderfund

At an October 13, 2009 Board meeting for the District, Besson gave a speech, during the

"public comment" time, challenging the District's appointment of Hunderfund as

Superintendent. At the time, Hunderfund was serving as the interim superintendent. In his

speech, Besson argued that Hunderfund's past ethical violations, high salary, and lack of

background with minority students suggested that he was not the best choice for the district, and

that a good faith effort should be made to search for an alternate superintendent.

Several of the administrators present felt that some of Besson's statements were factually

incorrect. Some administrators also felt that Besson should have addressed these concerns with

Hunderfund in private. Hunderfund confirmed that he was insulted and disappointed at Besson's remarks at the Board meeting, and disappointed in Besson's character. (Hunderfund Dep., at 290-91.)

Shortly after the Board meeting, the Union President, Bonnie Dresca, allegedly told Besson that Hunderfund was not happy with him, and directed her to tell Besson not to do it again. Dresca advised Besson to expect retaliation. Brown apparently made similarly-themed comments to Besson.

Within a week of the meeting, the District teachers received an email from Hunderfund asking them not to speak out against the administration. Some administrators apparently felt that Besson should have addressed his concerns with Hunderfund in private.

Besson alleges that, after his October 2009 speech before the Board, he began noticing changes in the way he was treated at work. For instance, he noticed that necessary equipment would not be present in his classroom; that he was receiving less support from the school information technology department for the computers he used to teach his students; and that responses to his correspondence with school administrators were delayed more than before.

6. Alleged Retaliation Against Besson's Son, I.B.

In 2009, Besson's son, I.B., attended the District's Davison Elementary School (the "Elementary School"). At some point, Besson learned that I.B. was being taken from his classes for reading lessons, thereby causing him to fall behind in other subjects. Besson alleges that he was informed that the order to remove I.B. came from "higher up." Besson complained to the Principal of the Elementary School, Edward Tallon, after which Tallon subsequently pulled I.B. out of the separate reading group.

Following this incident, Besson sent I.B. to private school, at a significant cost.  Besson implies that this incident was an example of retaliation against him.

7.   The Alleged Discrimination/Retaliation in Besson's Terms of Employment

In April 2011, Besson learned that his position would be abolished for the 2011-2012 school year.  Ultimately, the District partially re-instated his position to half-time for that school year.  This partial reinstatement came with a substantially reduced salary and no health insurance or pension benefits.

Besson filed a grievance challenging the partial elimination of his position, but that grievance was denied by Hunderfund and the Board.  In early 2010, Besson was informed by an unnamed third-party that Hunderfund said he would "punish" him, "even if it meant shutting down the whole Business Department." (Besson Dep., at 255.)

Eventually, the District assigned another business teacher, Young, who is white, to teach classes that Besson had previously taught.  Young had more seniority than Besson, although Besson alleges that he was more proficient in teaching the relevant classes.

As justification for partially eliminating Besson's position, the Defendants point to the fact that New York State does not require students to take business courses to obtain a regents diploma, nor did the District require students to take business courses to graduate.  By contrast, New York State requires that students take Math, Science, Social Studies, English, Foreign Language, Physical Education, and Art to graduate with a Regents diploma.  The Defendants assert that the fact that business courses are not required makes them more vulnerable to cuts than courses that are required.  Indeed, Banyon confirmed that Hunderfund was "part of the process" of cutting the business education teachers' salaries budget by $225,000. (Banyon Dep., at 195.)

After the complaint was filed in this action, the District reinstated Besson to a full-time position for the 2012-2013 school year. However, Besson was again reduced to part-time for the 2013-2014 school year.

D. Facts as to the Plaintiff Kenneth Smith

The District hired Smith, who is black, as a teacher in 2002 in the Middle School. Smith interviewed with Ricca for this position. During the hiring process, Ricca observed Smith teach a lesson. Ricca recommended that the District hire Smith.

According to Smith, on November 4, 2004, Ricca assigned Gilhuley and an individual with the surname Scricca to observe him. Smith believes that Ricca discriminated against him when assigning these two teachers to observe him, as opposed to observing Schroeder, a white teacher, and other white teachers. Smith notes that Scricca is known for giving unsatisfactory evaluations.

At some point, Ricca recommended that Smith be granted tenure, which he acquired in 2005.

Smith taught a sixth grade honors class while he was at the Middle School. Smith confirmed that he did not teach an honors class during his first year at the Middle School.

In the Fall 2005, at Smith's request, he was transferred to the High School.

1. Alleged Discrimination in Assignment of Classes, Conduct of Observations, and Access to Resources

Smith alleges that, in the High School from 2005 to 2007, he was assigned only lower-level and non-honors mathematics courses. Smith contends that the District did not assign him any honors classes to teach until the 2007-2008 school year. Smith considers "honors" courses to be the same as higher-level courses that are taught to more advanced students. By contrast, Ricca distinguishes between honors courses and courses that are taught to older or more

advanced students. Ricca told Smith that it is her personal practice not to give any teacher more than one honors class, although Ricca gave two honors classes to Lisa Bell-Matthews, another black mathematics teacher.

Smith maintains that Ricca discriminated against him by giving "credit" for his students' Regents examination passing rate to another teacher, Rachel Ruisi. Ruisi, who is white, was the students' teacher of record when they took the Regents examination. Smith did not report this alleged discrimination to anyone.

Smith further alleges that, in May 2009, a student named L.W. told him that L.W. knew Smith's schedule for the following year. Smith assumed that another mathematics teacher, Kristen Burban, told L.W. about Smith's schedule. Ricca told Smith that L.W. must have seen Smith's schedule on her desk at the chairpersons' office.

For the 2009-2010 school year, Sullivan, one of the District's mathematics teachers, took maternity leave. Sullivan's classes were distributed among the remaining mathematics teachers. Smith states that Ricca, coordinating with Romano, determined which teachers received Sullivan's classes while she was on maternity leave. In this regard, Smith alleges that several white teachers, including Christine Connell, were given the opportunity to take one of Sullivan's classes, while Smith was not.

Teachers earn additional income if they teach more than five classes. All of the full time teachers in the mathematics department had five classes before Sullivan went on maternity leave. While Smith is the only black math teacher Ricca has hired in her 12 year tenure as Math Chairperson, Ricca has hired seven Caucasian math teachers for grades 7-12 in that time.

Had Smith taken the class that Connell assumed, he would have been teaching four classes in a row. However, while Sullivan was on maternity leave, Ruisi was teaching four

classes in a row, on some days for five consecutive periods. Ricca acknowledged that Ruisi taught four classes in a row, but this was because there was no other mathematics teacher available to teach the Sullivan class that Ruisi assumed.

Smith never told Ricca that he wanted to teach one of Sullivan's classes, nor did Ricca ask Smith if he would like to assume one of Sullivan's classes. Smith does not know if any other teacher proactively requested one of Sullivan's classes.

On another occasion, Ricca told Smith that a teacher must have Advanced Placement ("AP") certification to teach AP courses, although Hunderfund's deposition testimony appears to contradict that assertion. Smith does not have AP certification and has made no effort to obtain AP certification. Smith asserts that he was never offered the opportunity to obtain his AP certification or teach AP courses, as were his white colleagues.

During the 2009-2010 school year, Ricca announced that teachers can earn additional income by teaching Regents review courses. Smith told Ricca that he was interested in teaching Regents review courses after school. Ricca told Smith that he could not teach Regents review classes after school because he was already supervising after-school detention. The Regents review courses were to be taught at the same time as after-school detention. Smith learned that another mathematics teacher, Lauren Knudsen, who is white, was teaching Regents review classes before school. Smith would have liked to teach Regents review classes before school. Knudsen told Ricca that Knudsen's students could not undergo review after school and wanted to come before school. By contrast, Smith never proactively asked Ricca if he could teach Regents review classes before school.

Ricca advised all of the mathematics teachers about a "THAT" (Technology Helps All Teachers) conference regarding use of the graphing calculator. The THAT conference, which

Smith did not attend, was offered on a Saturday. Smith alleges that Ricca did not inform Plaintiff about the THAT conference until the registration date had already passed. Although teachers cannot be compelled to attend a conference on a Saturday, the Defendants contends that several teachers voluntarily attend the THAT conference annually. Indeed, throughout the 2009-2010 school year, Smith allegedly was not afforded the same professional development opportunities that his white colleagues were offered.

Ricca observed Smith's classroom in October 2009. According to District procedure, a post-observation conference is always held between the observing administrator and the observed teacher. Smith and Ricca exchanged e-mails regarding the October 2009 post-observation conference. They scheduled the post-observation conference during Smith's eighth grade hall duty. Smith assumed that Ricca would relieve him of his hall duty. Ricca conducts approximately 20 to 30 percent of her post-observation conferences in the hallway while the teacher who was observed does hall duty.

However, Smith realized that Ricca intended to hold the conference in the hallway when Ricca sat down next to him and started the conference. During this conference, Ricca pointed out to Smith that there was an incorrect answer on the board when class ended one day. Ricca felt that Smith should have corrected the answer before the students left for the day. Smith disagreed. According to Smith, he left the answer on the board because it was put up there by a student with low confidence. Smith asserted that he did not want to damage the student's confidence by changing the answer, and, in any event, the answers were often discussed the next day, so the students knew the answer was incorrect. Ricca asserts that Smith raised his voice, while Smith asserts that Ricca was the one who raised her voice. Although Ricca assured Smith that she has met with other teachers in the hallway for their post-observation conferences, Smith

felt this forum constituted a violation of his privacy.  Smith felt "publicly disgraced amongst faculty staff and student."

The District's administration told Ricca that the mathematics department would have three Promethean Boards.  A Promethean Board is an interactive board that can be used in delivering instruction.  Ricca assigned the boards to classrooms that the District had dedicated as mathematics classrooms.  Smith's classroom was a Special Education classroom, which is why Ricca did not put a Promethean board in Smith's room.  During the 2009-2010 school year, white math teachers Ruisi, Pryor, and Knudsen had Promethean Boards and newer computers in their classrooms, when Smith did not.  Despite Smith's complaints about his old computer, Ricca did "[n]othing much" to help him obtain a new one. (Id. at 104-05.)

After Benedith was promoted to Assistant Principal, the District needed to hire someone to replace her as Dean.  At some point thereafter, Hunderfund told Besson that he should apply for the position.  Hunderfund phoned Gilhuley and told him that he should interview Smith and another teacher, Daniel Nehlsen, who is white, for the position.  However, Smith asserts that Hunderfund never recommended him for the Dean's position.  At the time it was late in the summer, and Gilhuley did not have time to organize a hiring committee.  The District ultimately hired Nehlsen for the Dean position.  According to Gilhuley, he made the "ultimate decision" to hire Nehlsen. (Gilhuley Dep., at 52-53.)  The Dean of Students' position at the Middle School pays about $125,000 per year, or about $28,000 more per year than Smith earned.

Nehlsen was the District's Student Activities Coordinator before becoming the Dean.  In the position of Student Activities Coordinator, Nehlsen was the "head" over teachers who supervised student clubs and activities.  Gilhuley liked what he saw when he observed Nehlsen in his role as the Student Activities Coordinator.  However, Smith also had more seniority in the

District than did Nehlsen. Prior to his appointment as Dean of Students at the Middle School, Nehlsen had no experience actually working the Middle School.

Prior to his application to the Dean of Students position, Smith taught at the Middle School. However, Gilhuley knew Nehlsen better and thought that Nehlsen gave a better interview than did Smith. Gilhuley has only hired one black teacher in his six year tenure as Principal of the Middle School.

After Smith did not acquire the Dean position, Hunderfund and Brown, the High School's Principal, offered to give Smith certain administrative work so that Smith could gain experience as an administrator. Smith declined this offer.

In October 2009, Ricca told Smith that he needed to use the TI 83 or TI 84 Plus graphing calculator when teaching his students. New York State mandates that teachers use this calculator when teaching certain topics in mathematics. New York State drafts its Regents examinations based on the assumption that students will use the calculator. Therefore, if a student does not effectively use the graphing calculator, he or she will not finish the examination. The parties dispute whether Smith was in fact using the calculator in his lessons. The Defendants note that Ricca learned that Smith's students told other mathematics teachers during extra help sessions that Smith did not teach them how to use the graphing calculator. However, Smith points out that Ricca was never able to identify a single student who allegedly complained about his teaching of the calculator or the lack of such instruction.

In June 2010, Ricca and Brown met with Smith and told him that he still was not using the graphing calculator in his lessons as frequently as expected. Ricca told Smith that his students complained that they had not been taught how to use the graphing calculator. Brown told Smith that it was important that Smith's students be on the same playing field as students

who had other mathematics teachers. Ricca emphasized the importance of the calculator in the mathematics curriculum. Smith offered to teach the calculator instead of reviewing for the Regents examination with his students. Ricca and Brown responded that Smith should continue reviewing, but should teach the calculator at the end of the school year. Smith acknowledges that Brown was right to be concerned if a teacher was not following his chairperson's directives.

That year, there was one question on the Trigonometry Regents examination that solely tested a students' ability to use the graphing calculator. Smith's students apparently performed more poorly than did other District students on this question. Ricca felt that this was proof positive that Smith was not teaching the graphing calculator as directed.

    2.  <u>The Alleged Retaliation for the Anonymous Complaint Letter</u>

Banyon, Benedith, and Romano called Smith into a meeting on June 7, 2010. At this meeting, Smith learned that someone had submitted an anonymous letter to the New York State Education Department. Smith did not author this letter. Rather, the co-plaintiff Besson wrote the letter.

Banyon asked Smith if he knew of any inappropriate conduct occurring during the administration of Mathematics Regents examinations. Smith said that every teacher in the Mathematics Department except for himself has given improper assistance to students during Regents examinations. Smith believed that these teachers gave improper assistance because he saw them "lingering" near students for longer than Smith thought appropriate. However, Smith could not hear anything that any of these teachers said to students while they were "lingering." Smith did not report anything else at this meeting. Smith later met with Hunderfund, Brown, and his union representative.

Smith believes Hunderfund singled him out regarding the anonymous letter due to his race. Smith alleges that Hunderfund asked him if he wrote the letter. Smith denied writing the letter. Smith told Hunderfund that he felt other Mathematics teachers were "too liberal as far as helping the kids on a Regents exam." (Smith Dep., at 153.) Hunderfund asked Smith why he did not tell anyone about what he observed. The only person Smith told about what he had seen was the co-plaintiff Besson. Smith did not report what he had seen to any District Administrator. Ricca and Hunderfund were disappointed that Smith did not report his concerns to a District administrator. Hunderfund sent a letter, dated June 11, 2010, to the New York State Department of Education summarizing the findings of the investigation in the letter.

Following the investigation, Smith believed that his District e-mail account had been tampered with. On June 18, 2010, Brown asked Smith to meet with him. Brown told Smith that he wanted to meet with him about Smith's concerns about his District e-mail account. Brown told Smith that he did not need a union representative. Smith would not meet with Brown, upsetting Brown. According to Brown, no teacher ever refused to meet with him in his entire career. Brown reported this incident to his superiors, and requested that Smith be transferred to the Middle School.

Also, several teachers reported to Brown that they saw Smith taking pictures of a Regents examination. Brown called Smith down to his office to discuss this allegation, and asked him if he did, in fact, take such pictures. Smith denied this. Smith felt slandered by this incident.

Smith also learned that Brown asked two teachers about whether Smith helped them clear calculators for students during a State examination.

Also, a teacher observed Smith's handwriting on a student's take-home examination. Smith maintains that he only helped the student with general concepts. Ricca and another

teacher, Kristen Burban, who is white, met with the student and asked him why Smith's handwriting was on his test.

    3.   <u>The Transfer from the High School to the Middle School</u>

In August 2010, Smith was transferred to the Middle School. Smith was not docked pay. On August 23, 2010, Banyon sent Smith a letter outlining the reasons for his transfer. Banyon suggested that Smith speak with his union representative. Smith met with Banyon, Nehlsen, union President Michelle Thomson, and union representative Natasha Green. Smith was advised that he was being transferred because he was insubordinate to Brown and because he did not teach his students how to use the graphing calculator.

Smith filed a grievance about the transfer, and attended a related arbitration hearing. Thompson and a labor specialist from the New York State United Teachers represented Smith at this arbitration. Smith had the opportunity to explain his version of events at the arbitration. The arbitrator upheld Smith's transfer to the Middle School, but ruled that Smith could request to transfer back to the High School after three years so long as he completed training regarding the graphing calculator.

Once Smith arrived at the Middle School, he assumed the schedule of Jeff Furman, the white teacher that he replaced. Furman was only assigned to teach one honors class. The following year, Smith was given an honors class with only 11 students. Smith believes he was purposely given a small class in further retaliation for his allegations, and because he is Black.

After transferring to the Middle School, Smith resigned from his position supervising after-school detention. Smith resigned from this position because he did not enjoy having students ask him why he was transferred to the Middle School.

E.  Procedural History

    In August 2010, Besson filed an EEOC complaint against the District for racial discrimination and retaliation.

    On October 28, 2010, Smith filed an EEOC complaint against the District for racial and gender discrimination.

    In September 2011, Besson filed his second EEOC complaint alleging racial discrimination and retaliation by the District.

    As noted above, on December 7, 2011, the Plaintiffs brought this complaint and lawsuit.

    Benedith brings claims for a hostile work environment on the basis of race; race discrimination and retaliation on the basis of race in violation of the 42 U.S.C. § 1981; the NYSHRL; the NCHRL; and the Equal Protection Clause of the United States Constitution under 42 U.S.C. § 1983.  As Benedith did not file a charge of discrimination with the EEOC, she does not bring her claims pursuant to Title VII.

    Besson brings claims for a hostile work environment on the basis of race; race discrimination and retaliation on the basis of race in violation of Title VII; the 42 U.S.C. § 1981; the NYSHRL; the NCHRL; and the Equal Protection Clause of the United States Constitution under 42 U.S.C. § 1983.  Besson also claims that the Defendants violated his constitutional rights of freedom of speech, as protected by the First Amendment to the United States Constitution, by retaliating against him for his speech on matters of public concern and his complaints of racial discrimination.  Besson also claims that the Defendants deprived him of his "right to privacy" in his educational decisions for his children, as secured by the Fourteenth Amendment to the United States Constitution, by (1) retaliating against him for his decision to send his daughter to a private school and (2) his questioning the means by which his son was being educated.

Smith brings claims for a hostile work environment on the basis of race and race discrimination in violation of the Title VII; 42 U.S.C. § 1981; the NYSHRL; the NCHRL; and the Equal Protection Clause of the United States Constitution under 42 U.S.C. § 1983. In addition, Smith claims that the Defendants violated his constitutional rights of freedom of speech, as protected by the First Amendment to the United States Constitution, by retaliating against him for his perceived speech on matters of public concern.

Before the Court addresses the Plaintiffs' respective claims, the Court sets forth a few preliminary matters applicable to each of them.

First, the Plaintiffs do not specify whether they are suing the individual defendants in their official capacities or in their personal capacities. "The Supreme Court has explained that personal-capacity suits seek to impose personal liability upon a government official for actions he [or she] takes under color of state law whereas official-capacity suits, in contrast, generally represent only another way of pleading an action against an entity of which an officer is an agent." Davis v. Cnty. of Nassau, 355 F. Supp. 2d 668, 675 (E.D.N.Y. 2005)(citation and quotation marks omitted).

The Plaintiffs' request for monetary damages, the Defendants' affirmative defenses, and the parties' briefs on these motions all seem to be based on the assumption that the claims against the individual defendants are in their personal capacities. Marino v. Mobilia, 94 CV 5003 (SJ), 1996 WL 748353, at *2 n. 2 (E.D.N.Y. Dec. 11, 1996). Therefore, the Court assumes that the claims brought against the individual defendants are brought against them in their personal capacities.

Second, the NCHRL does not provide a right of action and, therefore, those claims are dismissed. Kohutka v. Town of Hempstead, 11-CV-1882 (ADS)(WDW), 2014 WL 320630, at

*25 (E.D.N.Y. Jan. 29, 2014)(citing <u>Chesney v. Valley Stream Union Free Sch. Dist.</u> No. 24, 05 CIV 5106(DRH)(ETB), 2007 WL 1288137, at *4 (E.D.N.Y. Apr. 30, 2007), <u>reconsideration denied</u>, 11-CV-1882 (ADS)(WDW), 2014 WL 814931 (E.D.N.Y. Mar. 3, 2014).

## II.  DISCUSSION

### A.  <u>The Legal Standard on Summary Judgment</u>

Summary judgment may not be granted unless all of the submissions taken together "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. <u>Nunn v. Mass. Cas. Ins. Co.</u>, ⸺ F.3d ⸺, 2014 WL 1924465, at *3 n. 4 (2d Cir. May 15, 2014).  Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must set out specific facts showing a genuine issue for trial, and cannot rely merely on allegations or denials contained in the pleadings. <u>See</u> Fed. R. Civ. P. 56(c); <u>accord</u> <u>Fabrikant v. French</u>, 691 F .3d 193, 205 (2d Cir. 2012).  "[C]onclusory statements, conjecture, and inadmissible evidence are insufficient to defeat summary judgment." <u>Ridinger v. Dow Jones & Co. Inc.</u>, 651 F.3d 309, 317 (2d Cir. 2011) (citation omitted).

In cases involving claims of employment discrimination, "an extra measure of caution is merited" in granting summary judgment because "direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions." <u>Schiano v. Quality Payroll Sys., Inc.</u>, 445 F.3d 597, 603 (2d Cir. 2006)(citation omitted).  Nonetheless, "a plaintiff must provide more than conclusory allegations to resist a

motion for summary judgment." Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008).

Ultimately, the test for summary judgment is whether "a reasonable jury could return a verdict for the nonmoving party." Nunn, 2014 WL 1924465, at *3 n. 4 (citation omitted).

B.  Are the Plaintiffs' NYSHRL Claims Barred by the Notice of Claim Statute?

Employment discrimination claims that are brought against a school district, board of education, or school officer are subject to the notice of claim requirements contained in Education Law § 3813(1).   New York Education Law § 3813 states that no action shall proceed against a school district unless "it shall appear by and as an allegation in the complaint or necessary moving papers that a written verified claim upon which such action … is founded was presented to the governing body of said district or school within three months after the accrual of such claim."   Compliance with this requirement is a condition precedent to suit. See Putkowski v. Warwick Valley Cent. Sch. Dist., 363 F. Supp. 2d 649, 653–54 (S.D.N.Y. 2005).

In this case, the Plaintiffs concede that they have not filed notices of claim on the District, nor on the Individual Defendants, and expressly forgo any claims under the NYSHRL against the District.   Under the New York Education Law, the term "school officer" is defined as follows:

> The term "school officer" means a clerk, collector, or treasurer of any school district; a trustee; a member of a board of education or other body in control of the schools by whatever name known in a union free school district, central school district, central high school district, or in a city school district; a superintendent of schools; a district superintendent; a supervisor of attendance or attendance officer; or other elective or appointive officer in a school district whose duties generally relate to the administration of affairs connected with the public school system.

Education Law § 2(13).   "Based upon this definition, it is obvious that Superintendent [Hunderfund] is a school officer." Carlson v. Geneva City Sch. Dist., 679 F. Supp. 2d 355, 367 (W.D.N.Y. 2010).   Therefore, no claims under the NYSHRL may proceed against Hunderfund.

On the other hand, the Court determines that neither Brown nor Romano are school officers. "In that regard, this Court is aware of only [three] district court decisions which have interpreted the term 'school officer' in connection with § 3813(1), and [all three] concluded that a school principal is not a school 'officer,' as defined by the Education Law." Id.; see Spencer v. City of New York, No. 06 Civ. 2852 (KMW), 2007 WL 1573871, at *3 (S.D.N.Y. May 30, 2007)(notice of claim provision in § 3813(1) does not apply to school employees who are not school officers within the meaning of the statute); Richards v. Calvet, No. 99 Civ. 12172 (RJH)(MHD), 2005 WL 743251, at *13 (S.D.N.Y. Mar. 31, 2005)(notice of claim under § 3813(1) was not required before suing school principal, who was not a school officer within the meaning of § 3813(1)).

As in Carlson, this Court agrees that a principal is not a "school officer" under § 3813(1). The Court finds the following reasoning in Carlson to be persuasive:

> In the first place, it is clear that a principal is not an officer of a board of education. Moreover, although a principal is the administrative head of a particular school, such position is not a district-wide office. Further, the statutory text of § 3813(2) indicates that administrators, teachers, and other school employees are not included within the scope of § 3813(1): "Notwithstanding anything to the contrary hereinbefore contained in this section, no action or special proceeding founded upon tort shall be prosecuted or maintained against *any of the parties named in this section or against any teacher or member of the supervisory or administrative staff or employee . . . .*" Education Law § 3813(2) (McKinney 2009)(emphasis added). Such wording indicates that administrators, teachers, and other school employees, are not covered by § 3813(1). Accordingly, a principal is not an "officer of a school district."

Carlson, 679 F. Supp. 2d at 367. Therefore, with regard to Brown and Romano, the Court finds that the Plaintiffs were not required to comply with the notice and pleading requirements of § 3813(1) and the Plaintiffs' NYSHRL claims may proceed against them.

Whether Ricca, as the District's Mathematics Chairperson, qualifies as a "school officer" presents a question of first impression. Upon review of the record, the Court finds, as a matter of

law, that the Mathematics Chairperson is a district-wide office "whose duties generally relate to the administration of affairs connected with the public school system." Accordingly, the Court holds that Ricca is a "school officer" within the meaning of the Education Law. Therefore, the Plaintiffs' failure to serve Ricca with a notice of claim precludes their NYSHRL claims against her.

## C. Benedith's Claims

### 1. The Race-Based Hostile Work Environment Claims

Benedith first alleges that the Defendants caused or perpetuated a hostile work environment on the basis of race in violation of Section 1981, Section 1983, the Equal Protection clause, and the NYSHRL.

The standard for showing a hostile work environment under Section 1981, Section 1983, the Equal Protection Clause, and the NYSHRL is essentially the same. Demoret v. Zegarelli, 451 F.3d 140, 149 (2d Cir. 2006)("[Section] 1983 and the Equal Protection Clause protect public employees from various forms of discrimination, including hostile work environment . . . on the basis of gender. Once action under color of state law is established, the analysis for such claims is similar to that used for employment discrimination claims brought under Title VII. . . ."); see also Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 19 n. 4 (2d Cir. 2014) ("The same standards apply to the plaintiffs' hostile environment claims arising under the NYSHRL, and to their claims arising under 42 U.S.C. § 1981.")(citations omitted).

In general, to prevail on a hostile work environment claim, a plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment." Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000)(internal quotations omitted)(superseded by statute on

other grounds, Local Civil Rights Restoration Act of 2005, N.Y.C. Local Law No. 85).  In addition, to succeed on a hostile work environment claim against an employer, the plaintiff must show that "a specific basis exists for imputing the conduct that created the hostile environment to the employer." Petrosino v. Bell Atlantic, 385 F.3d 210, 221 (2d Cir. 2004)(internal quotations omitted).  While single incidents of harassment generally do not create a hostile work environment, a plaintiff may nevertheless avoid summary judgment in a case involving a single instance of harassment by showing that it was "extraordinarily severe." Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 69 (2d Cir. 2000)(quoting Cruz, 202 F.3d at 570).

Furthermore, an adverse employment action is not always required to sustain a hostile work environment claim. See Raniola v. Bratton, 243 F.3d 610, 617 (2d Cir. 2001)("Whereas other disparate treatment claims may scrutinize discrete harms such as hiring or discharge, a hostile work environment claim analy[zes] a workplace environment as a whole."); cf. Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)(no demonstration of "injury" required for a hostile work environment claim).

The Court first addresses whether triable issues of fact exist as to the presence of a hostile work environment on the basis of race and then each of the Defendants' potential liability.

Here, the Court concludes that Benedith has presented sufficient evidence – largely based on the acts of Brown – of the presence of a hostile work environment directed at Benedith on the basis of her race.  Between 2008 and 2011, while Benedith was an Assistant Principal at the High School, Brown regularly called her "nigger."  Given the frequency of the conduct, and entirety of the circumstances, the Court concludes that a reasonable jury could find that Brown's conduct created a hostile or abusive environment on the basis of race.  "The message relayed through all of the harassment appears to this Court to be unambiguously demeaning, and

sufficient for the Court to conclude that a reasonable person would have found that Defendants' conduct contributed materially to the creation of a hostile work environment." Price v. Gizzi, No. 1:11-CV-0976 (LEK)(RFT), 2012 WL 2120028, at *7 (N.D.N.Y. June 11, 2012).

"A recurring point in [Supreme Court] opinions is that simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998)(citations omitted); see also Harris, 510 U.S. at 21, 114 S. Ct. 367, 372, 126 L. Ed. 2d 295 ("'mere utterance of an . . . epithet which engenders offensive feelings in an employee,' does not sufficiently affect the conditions of employment to implicate Title VII. Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview.").

However, while a few isolated racial slurs may not create a hostile work environment, see Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997), the repeated use of certain clearly offensive and abusive language can create a hostile work environment. Whidbee, 223 F.3d at 69. Further, "[t]he offensiveness of the individual actions complained of is also a factor to be considered in determining whether such actions are pervasive." Carrero v. New York City Housing Auth., 890 F.2d 569, 578 (2d Cir. 1989).

One court has aptly observed that "[f]ar more than a 'mere offensive utterance,' the word 'nigger' is pure anathema to African-Americans. Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates." White v. BFI Waste Services, LLC, 375 F.3d 288, 298 (4th Cir. 2004)(quoting

Rodgers v. Western-Southern Life Ins. Co., 12 F.3d 668, 675 (7th Cir. 1993)(citation and internal quotation marks omitted)). Or, as another court noted, "[g]iven American history, we recognize that the word 'nigger' can have a highly disturbing impact on the listener. Thus, a plaintiff's repeated subjection to hearing that word could lead a reasonable factfinder to conclude that a working environment was objectively hostile." Hrobowski v. Worthington Steel Co., 358 F.3d 473, 477 (7th Cir. 2004)(citations and footnote omitted); McKay v. Principi, No. 03 Civ. 1605 (SAS), 2004 WL 2480455, at *6 (S.D.N.Y. Nov. 4, 2004)(collecting cases stressing the harmful effects of the use of the word "nigger" in the workplace).

In the present case, taken together, the Court finds that issues of fact exist as to whether the frequency and severity of the harassment alleged in this case materially altered Benedith's work environment for the worse. The fact that the source of this racial slur was black as well does not alter this Court's determination that a reasonable jury could find that the working environment was objectively hostile for Benedith on the basis of her race.

To be sure, the Court's finding that there are issues of fact as to the existence of a hostile work environment on the basis of race is only the first step in determining if there may be liability with regard to any of the Defendants. The Court now addresses whether the hostile work environment may be imputed to Benedith's municipal employer, the District, and the Individual Defendants.

The Defendants contend that even if Benedith has established a viable employment discrimination claim based on a hostile work environment claim, such claim would barred as against the District by the Faragher/Ellerth defense because (1) through its anti-discrimination policy, it exercised reasonable care to prevent and correct promptly any racially harassing

behavior and (2) Benedith has unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer to avoid harm.

"Against employee claims of hostile work environment . . . , the employer may have recourse to the so-called Faragher/Ellerth affirmative defense." Ferraro v. Kellwood Co., 440 F.3d 96, 101 (2d Cir. 2006). "The defense comprises two elements: that (1) 'the employer exercised reasonable care to prevent and correct promptly any [discriminatory] harassing behavior,' and (2) 'the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.'" Id. (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 807, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998), and Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 766, 118 S. Ct. 2257, 141 L.Ed.2d 633 (1998)).

However, the employer may only raise the defense if "the employee's supervisor took no tangible employment action" or "any tangible employment action taken against the employee was not part of the supervisor's discriminatory harassment." Ferraro, 440 F.3d at 101. "The word 'culminate' requires that the tangible employment action be linked to the supervisor's discriminatory harassment." Id. at 102.

Here, in this case, the Faragher/Ellerth defense is inapplicable because it is undisputed that that the District took two tangible employment actions against Benedith – the denial of tenure and the termination of her employment. Rajaravivarma v. Bd. of Trustees for Connecticut State Univ. Sys., 862 F. Supp. 2d 127, 148 (D. Conn. 2012)("Here, it is undisputed that Plaintiff is a member of a protected class and that he suffered an adverse employment action when he was denied tenure."). Further, the denial of tenure could be construed as the culmination of the hostile work environment because Brown did not recommend Benedith for tenure. Nally v. New

York, 1:10-CV-1186 (MAD)(CFH), 2013 WL 2384252, at \*20 (N.D.N.Y. May 30, 2013 ("In order to avoid an employer's assertion of <u>Faragher/Ellerth</u> on this basis, however, there must be a nexus between the employment action and the harassing conduct at issue."); <u>Edrisse v. Marriott Int'l Inc.</u>, 757 F. Supp. 2d 381, 388 (S.D.N.Y. 2010)("[t]his is so because harassment typically falls outside the scope of a supervisor's duty, negating vicarious liability, but when the harassment includes or results in a tangible employment action, the employer as a legal matter has taken part in the harassing conduct"). Accordingly, the District cannot avail itself of the <u>Faragher/Ellerth</u> defense.

The Court next considers against which parties Benedith may bring her hostile work environment claims. In order to succeed on her Section 1981 and Section 1983 claims against the District, Benedith must show that, pursuant to the well-settled law of <u>Monell v. Department of Social Services</u>, 436 U.S. 658, 692–94, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978) and its progeny, "the challenged acts were performed pursuant to a municipal policy or custom." <u>Patterson v. Cnty. of Oneida, N.Y.</u>, 375 F.3d 206, 226 (2d Cir. 2004).

As to Brown, "[d]istrict courts in the Second Circuit have found that a public school principal acts as a final policymaker to the extent that the ultimate harm that befell the plaintiff was under the principal's control." <u>Zambrano-Lamhaouhi v. New York City Bd. of Educ.</u>, 866 F. Supp. 2d 147, 175 (E.D.N.Y. 2011); <u>see</u> <u>T.Z. v. City of New York</u>, 635 F. Supp. 2d 152, 179 n. 27 (E.D.N.Y. 2009)("A school principal has final policymaking authority in the management of the school and her conduct represents official district policy within the purview of the school."); <u>Williams v. Bd. of Educ.—City of Buffalo</u>, No. 07–CV–698C (JTC), 2008 WL 2946003, at \*3 (W.D.N.Y. July 29, 2008) (harassment by principal himself); <u>Lovell v. Comsewogue Sch. Dist.</u>, 214 F. Supp. 2d 319, 324 (E.D.N.Y. 2002)(principal failed to prevent students from harassing

homosexual teacher); Rabideau v. Beekmantown Cent. School Dist., 89 F. Supp. 2d 263, 268–69 (N.D.N.Y. 2000)(principal acquiesced in teacher's violation of student's first amendment rights). Here, the harm in the form of the hostile work environment was not only within the control of Brown as the principal, but was largely created by Brown himself.

Thus, Brown's actions could be attributed to the District as municipal policy. See e.g., Rookard v. Health and Hospitals Corp., 710 F.2d 41, 45 (2d Cir. 1983)("Where an official has final authority over significant matters involving the exercise of discretion, the choices he makes represent government policy."). Therefore, summary judgment on the Section 1981 and 1983 hostile work environment claims against the District is not appropriate and, for that reason, the Court denies the Defendants' motion for summary judgment dismissing Benedith's hostile work environment claim against the District.

Benedith has also asserted individual liability against the Defendants for a hostile work environment pursuant to Section 1983, 1981, and the NYSHRL. In general, to prove individual liability based on these causes of action, a plaintiff most show that the individual was personally involved in the alleged violations of rights. Patterson, 375 F.3d at 229 (regarding Section 1981); Stevens v. New York, 691 F. Supp. 2d 392, 400–01 (S.D.N.Y. 2009)(regarding the NYSHRL). Personal involvement for managers or supervisors in this context can include "failure to take action upon receiving information that constitutional violations are occurring." Patterson, 375 F.3d at 229.

As to Brown, the Court is satisfied that triable issues of fact exist as to his personal involvement in the presence of the alleged hostile work environment. According to Benedith's deposition testimony, Brown was the source of countless racial slurs directed at Benedith in Benedith's presence. Again, the Court declines to absolve Brown of liability as a matter of law

simply because he uttered racial slurs derogatory of his own race. Accordingly, the Court denies the Defendants' motion for summary judgment dismissing Benedith's hostile work environment claim against Brown.

The Court reaches a different conclusion with respect to the remaining individual defendants. As to Ricca, despite Benedith's testimony that she is not asserting any claims against Ricca, Benedith has refused thus far to stipulate to discontinue her claims against Ricca. The only allegation involving Ricca was that she was involved in Benedith's hiring as an Assistant Principal.

Similarly, Benedith points to only one instance of alleged discrimination by Romano. In particular, Romano apparently reprimanded Benedith in the presence of other white teachers. The Court finds that this incident, standing alone, cannot support a hostile work environment claim against Romano in his individual capacity.

As with Romano, the Court finds that there is insufficient evidence that Hunderfund contributed to the formation of a hostile work environment against Benedith on the basis of race. While Hunderfund did not recommend Benedith for tenure and Hunderfund did not approve of the pamphlet Benedith created for the Martin Luther King Day event, there is no evidence these actions were based on race.

Accordingly, the Court denies the Defendants' motion for summary judgment dismissing Benedith's hostile work environment claim against Brown, and grants the motion for summary judgment dismissing Benedith's hostile work environment claims against Ricca, Romano, and Hunderfund.

2. Benedith's Race-Based Discrimination Claims

In addition to her hostile work environment claims, Benedith asserts claims against the Defendants for race-based discrimination in violation of 42 U.S.C. § 1981, the Equal Protection Clause, Section 1983, and the NYSHRL. The Court now addresses this portion of Benedith's claims.

As with the hostile work environment claims, "[d]iscrimination and retaliation claims brought under the NYSHRL, § 1981, and the Equal Protection Clause of the Fourteenth Amendment are subject to the same analysis as Title VII claims." D'Ambrosio v. Bast Hatfield, Inc., 6:12-CV-1895 (NAM)(TWD), 2014 WL 1311948, at *4 n. 5 (N.D.N.Y. Mar. 31, 2014).

To establish a *prima facie* case of race discrimination, a plaintiff must prove that (1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination. See Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003) (applying the same standard for race discrimination claims under Title VII); see also Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 714–15 (2d Cir. 1996) (applying the Title VII analytical framework for discrimination claims to Sections 1981 and 1983 and the NYSHRL). A plaintiff's burden at the *prima facie* stage to offer evidence of circumstances giving rise to an inference of discrimination is "'minimal' and '*de minimis.*'" Zimmerman v. Assocs. First Capital Corp., 251 F.3d 376, 381 (2d Cir. 2001)(quoting Byrnie v. Town of Cromwell, 243 F.3d 93, 101 (2d Cir. 2001); Abdu–Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 467 (2d Cir. 2001)).

In this case, the Defendants do not dispute that Benedith is a member of a protected class or that she suffered an adverse employment action in the form of the denial of tenure and her

termination of employment. Rather, the Defendants maintain that these adverse employment actions did not occur under circumstances giving rise to an inference of discrimination.

As with the hostile work environment claims, there is no evidence that Romano and Ricca played any role in the District's decision to deny Benedith tenure or to terminate her employment. Therefore, the Court grants the Defendants' motion for summary judgment dismissing Benedith's race-based discrimination claims against Romano and Ricca.

By contrast, as to Hunderfund, there is circumstantial evidence that the Benedith's termination – which was recommended to the Board of Education by Hunderfund – was motivated in part by race. Johnson v. Connecticut Dep't of Corr., 392 F. Supp. 2d 326, 339 (D. Conn. 2005)("the court is mindful that discrimination claims are often premised on circumstantial evidence that has weight when considered together."), aff'd sub nom. Johnson v. State of Connecticut Dep't, 225 F. App'x 42 (2d Cir. 2007). At about the same time Benedith was denied tenure, Hunderfund personally approved the award of tenure to three Caucasian administrators. Banyon confirmed in his deposition that, as a result of these personnel decisions, ten of the eleven District Administrators were white.

On the other hand, the District hired five black administrators, including Benedith, under Hunderfund's administration. Hunderfund also recommended Marietta Cleckley, a black administrator hired by the previous administration, for tenure. Nevertheless, in the Court's view, Benedith advances sufficient evidentiary proof to defeat summary judgment as to the *prima facie* element of an inference of race discrimination against Hunderfund.

Indeed, "[i]t is well settled . . . that the mere fact that a plaintiff was replaced by someone outside the protected class will suffice to establish the required inference of discrimination at the *prima facie* stage." Dabney v. Christmas Tree Shops, No. 10 Civ. 8734 (CS), 2013 WL 3820668,

at *5 (S.D.N.Y. July 24, 2013)(quoting Zimmerman v. Assocs. First Capital Corp., 251 F.3d 376, 381 (2d Cir. 2001)(internal quotation marks omitted)); see Thomas v. iStar Fin., Inc., 438 F. Supp. 2d 348, 359 (S.D.N.Y. 2006)(*prima facie* case established where an African–American man replaced by a white woman), aff d, 629 F.3d 276 (2d Cir. 2010); Carlton v. Mystic Transp., Inc., 202 F.3d 129, 135 (2d Cir. 2000)(inference of age discrimination raised where the 57-year old plaintiff replaced by two substantially younger employees).

Here, after Benedith's termination, her job duties as Assistant Principal were assumed by Benfante, who is white. In Montana v. First Federal Sav. And Loan Ass'n of Rochester, 869 F.2d 100, 105 (2d Cir. 1989), the Second Circuit held that a plaintiff need not show that he or she was replaced by a newly hired person. There, the Second Circuit recognized an inference of age discrimination where plaintiff's duties were assumed by a co-worker and newly hired employee who were both approximately 30 years younger.

The Defendants make much of the fact that, at least as to Hunderfund and Brown, they were both involved in Benedith's hiring and termination. In particular, while Hunderfund participated in the District's decision to hire Benedith as the Middle School Dean and recommended Benedith's appointment as Assistant Principal at the High School to the Board of Education, he declined to recommend her for tenure. Similarly, while Brown recommended Benedith to Hunderfund for Assistant Principal, Brown did not recommend Benedith for tenure because of apparent performance deficiencies.

Under these circumstances, the Defendants invoke the so-called "same actor" doctrine and ask this Court to hold, as a matter of law, that no reasonable jury could find Hunderfund and Brown liable for race discrimination against Benedith. The Second Circuit has explained that under this "same actor" doctrine, there are certain factors that "strongly suggest that invidious

discrimination was unlikely.  For example, when the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to [him] an invidious motivation that would be inconsistent with the decision to hire." Grady v. Affiliated Cent., Inc., 130 F.3d 553, 560 (2d Cir. 1997).

However, this inference becomes less compelling when a "significant period of time elapses between the hiring and firing." Carlton v. Mystic Transp. Inc., 202 F.3d 129, 138 (2d Cir. 2000).  This is because over the years, "an individual may develop an animus toward a class of people that did not exist when the hiring decision was made." Id. (quoting Buhrmaster v. Overnite Transp. Co., 61 F.3d 461, 464 (6th Cir. 1995)).  Although the Second Circuit has "not delineated a set time period after which the same actor inference does not apply," Jackson v. Post Univ., Inc., 836 F. Supp. 2d 65, 89 n. 54 (D. Conn. 2011), it has applied the same actor inference to a plaintiff that was "fired by the same man who had hired him three years earlier." Schnabel v. Abramson, 232 F.3d 83, 91 (2d Cir. 2000); cf. Carlton, 202 F.3d at 138 (finding seven years between hiring and termination significantly weakens the inference).

Further, even at the summary-judgment stage of litigation, "the same-actor inference is permissive, not mandatory, and even if the same individuals made both decisions, the Court would not be compelled to give [the defendant] the benefit of the inference." Memnon v. Clifford Chance US, LLP, 667 F. Supp. 2d 334, 351 (S.D.N.Y. 2009); see also Copeland v. Rosen, 38 F. Supp. 2d 298, 305 (S.D.N.Y. 1999) ("The 'same actor' inference is not a necessary inference, it is only a plausible one, and decisions in this Circuit addressing it have warned that its use is not to become a substitute for a fact-intensive inquiry into the particular circumstances of the case at hand.")(citing, among other cases, Grady, 130 F.3d at 560)

With these principles in mind, the Court finds that "same-actor" inference does not, as a matter of law, foreclose Benedith's claim of racial discrimination against Brown and Hunderfund because Benedith was terminated approximately four years after she was hired by the District.

However, the Court finds that Benedith has not created a triable issue of fact as to race discrimination against Brown. In this regard, "courts draw an inference against discrimination where the person taking the adverse action is in the same protected class as the effected employee." Baguer v. Spanish Broad. Sys., Inc., No. 04 Civ. 8393 (RJS), 2010 WL 2813632, at *11 (S.D.N.Y. July 12, 2010), aff'd, 423 Fed. App'x 102 (2d Cir. 2011); Eder v. City of N.Y., No. 06 Civ. 13013 (RWS), 2009 WL 362706, at *8 (S.D.N.Y. Feb. 12, 2009) (finding no inference of discrimination and awarding the defendant summary judgment where the plaintiff and her "immediate supervisor who assessed [her] performance and determined that it was lacking are members of the same protected class"); Tucker v. N.Y. City, No. 05 Civ. 2804 (GEL), 2008 WL 4450271, at *5 (S.D.N.Y. Sep. 30, 2008) ("[A]ny inference of race discrimination is further undermined by the fact that all three superintendents under whom [plaintiff] worked as well as three of his four direct supervisors at the DOE were also African–American."); Sykes v. Mt. Sinai Med. Ctr., 967 F. Supp. 791, 797 (S.D.N.Y. 1997) (observing, in granting summary judgment to the defendant, "the person making the decision to terminate plaintiff . . . was [of the same race]").

Here, considered in conjunction with the "same actor" inference, albeit an inference weakened by the passage of time between the hiring and denial of tenure, Benedith is hard-pressed to argue that Brown, also black, intentionally discriminated against her in failing to recommend her for tenure. Stated otherwise, while Brown may have fostered a hostile work

environment for Benedith based on race, the Court finds that Benedith's race-based discrimination claim against Brown is precluded as a matter of law, and dismisses that claim.

If the plaintiff satisfies her initial burden of establishing a *prima facie* case of discrimination, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. Ruiz v. Cnty. of Rockland, 609 F.3d 486, 492 (2d Cir. 2010). The defendant's burden "is not a particularly steep hurdle." Hyek v. Field Support Servs., 702 F. Supp. 2d 84, 93 (E.D.N.Y. 2010). It "is one of production, not persuasion; it 'can involve no credibility assessment.'" Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)(citation omitted).

Indeed, an employer sustains its burden "by producing any evidence of nondiscriminatory reasons, whether ultimately persuasive or not." Weeks v. New York State Div. of Parole, No. 00 CV 5865 (SJ), 2002 WL 32096593, at *4 (E.D.N.Y. Nov. 25, 2002)(citation omitted). "The employer need not prove by a preponderance of the evidence that the reasons for his actions were not discriminatory, but may simply 'present clear and specific reasons for the action.'" Gibbs v. Consol. Edison Co. of New York, Inc., 714 F. Supp. 85, 89 (S.D.N.Y. 1989)(citation omitted).

Here, the Court finds that the Defendants have set forth legitimate, non-discriminatory reasons for Benedith's denial of tenure and her ultimate termination. In this case, the Defendants point to, among other things, Benedith's alleged failure on the day of a Regents examination to give instructions to her secretary and the department chairpersons in her absence; a lack of satisfaction on the part of the High School teachers and the union with regard to Benedith's discipline of students; hosting noisy sessions with excessive numbers of students in her office, thereby earning Benedith's office the nickname "Club Benedith"; and complaints by the High School's security guards about Benedith, all of whom are black.

If the employer meets its burden to come forward with a legitimate, non-discriminatory reason for its action, the plaintiff is required to show that the defendant's stated reason is a pretext for prohibited discrimination. <u>Dawson v. Bumble & Bumble</u>, 398 F.3d 211, 216 (2d Cir. 2005). To defeat summary judgment, a plaintiff must show that a reasonable jury could find that Defendant's explanation is at least partially pretextual and that "unlawful discrimination was one of the motivating factors" in his termination. <u>Melman v. Montefiore Med. Ctr.</u>, 98 A.D.3d 107, 946 N.Y.S.2d 27, 40 (1st Dep't. 2012). "'[I]t is not the function of a fact-finder to second-guess business decisions regarding what constitutes satisfactory work performance." <u>Soderberg v. Gunther Int'l, Inc.</u>, 124 F. App'x 30, 32 (2d Cir. 2005)(citing <u>Dister v. Cont'l Group, Inc</u>., 859 F.2d 1108, 1116 (2d Cir. 1988)).

However, the fact that there is no indication that the Defendants cited these purported reasons for Benedith's denial of tenure and termination lends support to Benedith's assertion that these reasons were a pretext for race discrimination.

Further, "[a] plaintiff may show pretext by demonstrating that similarly situated employees of a different [race] were treated more favorably." <u>Delia v. Donahoe</u>, 862 F. Supp. 2d 196, 215 (E.D.N.Y. 2012)(citations and quotation marks omitted). According to Benedith, she was treated less favorably than Romano, who is white, who apparently would also have multiple students in his office at time, yet he was not disciplined, let alone terminated for that reason. Similarly, there is evidence that Benedith received a mid-year evaluation during the year she was qualified for tenure, while Romano did not receive such an evaluation.

Benedith also disputes several other allegations about her performance, for instance, that the High School teachers and the union expressed a lack of confidence in her leadership. Benedith testified that she was informed by union delegate Bonnie Dreska that the teachers were

satisfied with her performance. The Court declines to consider this hearsay comment by a non-party.

Nonetheless, in the Court's view, the Court finds that a reasonable jury could view the Defendants' proffered reasons for their actions as a pretext for race discrimination. Accordingly, the Court denies the Defendants' motion for summary judgment dismissing Benedith's race-based discrimination claims against Hunderfund.

With respect to the District's liability for racial discrimination, again a school district can be held liable under § 1981 or § 1983, but only if its "'policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.'" Back v. Hastings On Hudson Union Free Sch. Dist., 365 F.3d 107, 128 (2d Cir. 2004)(quoting Monell, 436 U.S. at 691, 98 S. Ct. 2018, 56 L. Ed. 2d 611). As the Second Circuit has made clear, a municipality or municipal agency can only be held liable for the conduct of an official where that official "ha[d] final authority over significant matters involving the exercise of discretion. . . . An official has final authority if his decisions, at the time they are made, for practical or legal reasons constitute the municipality's final decisions." Rookard, 710 F.2d at 45.

Here, Benedith has failed to establish a basis for the District's liability for his race discrimination claim. Although the Board apparently "rubber stamped" Hunderfund's recommendations with regard to personnel decisions (Hunderfund Dep. at 186-87.), neither Brown nor Hunderfund possessed "final policymaking authority" over the actions challenged – namely, the denial of tenure and the termination of her employment.

The case of Weinstein v. Garden City Union Free School District, No. CV 11–2509(AKT), 2013 WL 5507153 (E.D.N.Y. Sept. 30, 2013) is instructive. There, the plaintiff alleged that the defendant district's Assistant Superintendent for Business and the Director of

Facilities were policymakers whose actions imputed liability to the District. Based on its review of the law governing the statutory duties of boards of educations and superintendents, the Weinstein court determined that only the district's Board of Education, and not its Superintendent, Assistant Superintendent or Director of Facilities, had final policymaking authority with respect to District-wide decisions. Id. at *16-18. This was because even the decisions of the superintendent "constitute mere recommendations that must ultimately be adopted by the final policymaking body." Id. at *17 (citing N.Y. Education Law § 1711).

In this case, Brown simply recommended that Benedith not be granted tenure and Hunderfund recommended the termination of her employment. However, as in Weinstein, the ultimate decision rested, under the Education Law, with the Board. For this reason, the Plaintiff fails to identify a basis for Monell liability for his race discrimination claim. Accordingly, the Court grants the Defendants' motion for summary judgment dismissing Benedith's race-based discrimination claim against the District.

However, Benedith's race-based discrimination claim against Brown and Hunderfund survives, as the record suggests they were personally involved in Benedith's failure to attain tenure and/or the termination of her employment.

3. Benedith's Race-Based Retaliation Claims

As an initial matter, the Court notes that "[t]here is no authority for a retaliation claim under the Fourteenth Amendment when the protected activity is a complaint of race [] discrimination." Vega v. Hempstead Union Free Sch. Dist., 12-CV-6158 (SJF), 2014 WL 2157536, at *8 (E.D.N.Y. May 22, 2014); Bernheim v. Litt, 79 F.3d 318, 323 (2d Cir. 1996) ('[W]e know of no court that has recognized a claim under the equal protection clause for retaliation following complaints of racial discrimination."). Thus, to the extent Benedith relies

on the Equal Protection clause of the Fourteenth Amendment, his race-based retaliation claims are dismissed.

The Court thus considers Benedith's race-based retaliation claims under Section 1981, Section 1983, and the NYSHRL. Under these laws, in the absence of direct evidence of retaliation, a plaintiff alleging retaliatory adverse employment action usually relies on the burden-shifting McDonnell Douglas framework. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973); Cruz, 202 F.3d at 566 (citing cases). The plaintiff must show the following to make out a *prima facie* case of unlawful retaliation: (1) the plaintiff engaged in protected activity; (2) the defendant was aware of that activity; (3) the plaintiff suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. Distasio v. Perkin Elmer Corp., 157 F.3d 55, 66 (2d Cir. 1998).

"The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." Bryant v. Verizon Commc'ns Inc., 550 F.Supp.2d 513, 537 (S.D.N.Y. 2008)(citing Cruz, 202 F.3d at 566). "The onus is on the speaker to clarify to the employer that he is complaining of unfair treatment due to his membership in a protected class and that he is not complaining merely of unfair treatment generally." Aspilaire v. Wyeth Pharms., Inc., 612 F. Supp. 2d 289, 308–09 (S.D.N.Y. 2009)("While plaintiff may have believed that she was the victim of discrimination, an undisclosed belief of such treatment will not convert an ordinary employment complaint into a protected activity." )(citation omitted)(citing Dinice–Allen v. Yale–New Haven Hosp., No. 06 Civ. 00675 (PCD), 2008 U.S. Dist. LEXIS 1802, 2008 WL 160206, at *4 (D. Conn. Jan. 10, 2008)).

While a protected activity generally involves the filing of a formal complaint of discrimination with an administrative agency, <u>Kotcher v. Rosa & Sullivan Appliance Ctr.</u>, 957 F.2d 59, 65 (2d Cir. 1992), the Second Circuit has recognized that "protected activity" includes "informal protests of discriminatory employment practices, including making complaints to management." <u>Sumner v. U.S. Postal Serv.</u>, 899 F.2d 203, 209 (2d Cir. 1990). However, such informal complaints must be sufficiently specific to make it clear that the employee is complaining about conduct prohibited by federal law. <u>Risco v. McHugh</u>, 868 F. Supp. 2d 75, 110 (S.D.N.Y. 2012).

In this case, there is evidence that Benedith complained to Brown that Gilhuley had previously discriminated against her on the basis of race, but Benedith acknowledged that she could not recall what she actually told Brown. In any event, generalized complaints about a supervisor's treatment are insufficient to state protected activity. <u>Rojas v. Roman Catholic Diocese of Rochester</u>, 660 F.3d 98, 108 (2d Cir. 2011)(affirming district court's holding that plaintiff failed to state a *prima facie* case of retaliation because generalized complaint was not protected activity).

Further, even if Benedith's complaints about Gilhuley constituted a protected activity, there is no indication that the District was made aware of the protected activity. In <u>Galdieri–Ambrosini v. National Realty & Development Corp.</u>, 136 F.3d 276 (2d Cir. 1998), the Second Circuit ruled that "implicit in the requirement that the employer [was] aware of the protected activity is the requirement that the [employer] understood, or could have reasonably understood," that the plaintiff's complaints, constituting the protected activity, were based on conduct prohibited by federal law. <u>See</u> <u>id.</u> at 292. In particular, the Second Circuit upheld a district court's grant of a Rule 50(b) motion because a female plaintiff's complaints "did not state that

[she] viewed [a male supervisor's] actions as based on her gender, and there was nothing in her protests that could reasonably have led [the company] to understand that that was the nature of her objections." Id.; Rosioreanu v. City of New York, 526 F. App'x 118, 120 (2d Cir. 2013) cert. denied, 134 S. Ct. 1878 (2014).

In addition, even assuming Benedith engaged in protected activity of which the Defendants were made aware, the causal connection between Gilhuley's treatment of Benedith in the Middle School and the denial of tenure and termination of his employment in the High School is too attenuated to infer racial discrimination. There is also no evidence that Brown told anyone about Benedith's complaints of discrimination at the Middle School.

Further, there is no evidence that Benedith complained to anybody about Brown's behavior or that she was retaliated against for doing so. Accordingly, the Court grants the Defendants' motion for summary judgment dismissing all of Benedith's retaliation claims.

D. Besson's Claims

1. Besson's Race-Based Hostile Work Environment Claims

As noted above, courts examining hostile work environment claims should consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Schiano v. Quality Payroll Systems, Inc., 445 F.3d 597, 605 (2d Cir. 2006)(citing Harris, 510 U.S. 17, 23, 114 S. Ct. 367 (1993)).

Here, Besson identifies a number of examples of mistreatment that he contends contributed to the formation of a hostile work environment directed at him on the basis of race: (1) allegedly unfair performance evaluations; (2) unwarranted wage disparities; and (3) disparate administrative assignments, all on the basis of race.

As to the performance evaluations, the chart that Varol showed Besson reflects that, in fact, several white teachers received lower performance ratings than Besson. As to alleged disparities in wages and administrative assignments, the Court finds that these complaints do not do not rise to the level of severe or pervasive mistreatment to constitute a hostile work environment on the basis of race. Parekh v. Swissport Cargo Servs., Inc., No. 08–CV–1994 (CPS), 2009 WL 290465, at *5 (E.D.N.Y. Feb. 5, 2009)(granting motion to dismiss hostile work environment claim where "[p]laintiff's complaints concerning unfair disciplinary actions, shift changes, reduction in manpower, wrongfully withheld vacation time, failure to provide him with proper equipment, workplace transfers, failure to promote, and his termination contain no suggestion of hostility or offensiveness"); see also Bowen-Hooks v. City of New York, 10-CV-5947 (MKB), 2014 WL 1330941, at *40 (E.D.N.Y. Mar. 31, 2014).

The Court declines to consider the alleged retaliation against Besson's children in a hostile work environment analysis as too attenuated from Besson's workplace conditions. Indeed, these events outside the workplace are more logically connected to Besson's speaking out against Hunderfund at the Board meeting, rather than any animosity against Besson on the basis of race. There is also no indication that Besson's terms of employment were modified on the basis of race.

Accordingly, the Court finds that Besson has not come forward with sufficient evidence to withstand the Defendants' motion for summary judgment dismissing Besson's hostile work environment claims, under any of the operative sources of law cited in the complaint.

2. Besson's Race-Based Discrimination Claims

The Defendants do not dispute that Besson is a member of a protected class; that he was qualified for his position; and that the Defendants' reduction of the Plaintiff's position from full-

time to part-time constituted an adverse employment action.   However, the Defendants dispute whether Besson was subjected to additional adverse employment actions, and whether any adverse employment actions occurred under circumstances giving rise to an inference of discrimination.

Employment actions that the Second Circuit has deemed sufficiently disadvantageous to constitute an adverse employment action include "'a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.'" Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008)(quoting Williams v. R.H. Donnelley, Corp., 368 F.3d 123, 128 (2d Cir. 2004)(internal quotation marks omitted). "[T]here is no exhaustive list of what constitutes an adverse employment action.  Courts have held that termination, demotion, denial of promotion, addition of responsibilities, involuntary transfer that entails objectively inferior working conditions, denial of benefits, denial of a requested employment accommodation, denial of training that may lead to promotional opportunities, and shift assignments that make a normal life difficult for the employee, among other things, constitute adverse employment actions." Little v. NBC, 210 F. Supp. 2d 330, 384 (S.D.N.Y. 2002).

Here, as to additional adverse employment actions alleged, Besson points to (1) heightened scrutiny by Varol about his students' passing percentages; (2) unfairly low performance evaluations; (3) less desirable administrative duties; and (4) wage disparities with regard to other athletic coaches.

With respect to heightened scrutiny by an employer, it is well-settled that "[t]o qualify as an adverse employment action, excessive scrutiny must be accompanied by unfavorable

consequences." Scafidi v. Baldwin Union Free School Dist., 295 F. Supp. 2d 235, 239 (E.D.N.Y. 2003); see also Weeks v. N.Y. State Div. of Parole, 273 F.3d 76, 86 (2d Cir. 2001)("It hardly needs saying that a criticism of an employee . . . is not an adverse employment action.") (abrogated on other grounds); Hubbard v. Port. Auth. of New York and New Jersey, No. 05 Civ. 4396 (PAC), 2008 WL 464694, at *12 (S.D.N.Y. Feb. 20, 2008)(stating that "courts in this circuit have found that reprimands and . . . excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation")(internal quotation marks and citations omitted); Castro v. New York City Bd. of Educ. Personnel, No. 96 Civ. 6314 (MBM), 1998 WL 108004, at *7 (S.D.N.Y. Mar.12, 1998)(stating that "although reprimands and close monitoring may cause an employee embarrassment or anxiety, such intangible consequences are not materially adverse alterations of employment conditions").  Here, there is no evidence that the heightened scrutiny by Varol about his students' passing percentages was accompanied by other tangible, unfavorable consequences.

Similarly, the Court finds that the alleged unfair performance evaluations do not constitute an adverse employment action for purposes of the anti-discriminations statutes. Leon v. Dep't of Educ., 10-CV-2725 (WFK), 2014 WL 1689047, at *13 (E.D.N.Y. Apr. 29, 2014)("Plaintiff argues that deprival of her top-choice teaching assignment, *negative performance evaluations*, exclusion from certain extracurricular school activities, and questioning as to when she would retire constitute adverse employment actions.  But, none of those acts rises to the level of a materially adverse change in the terms and conditions of her employment sufficient to state a claim under the ADA . . . [and] NYSHRL")(emphasis added).

The Court reaches a different conclusion with respect to the allegedly disparate assignments and wage disparities, which plainly touch upon a term or condition of Besson's

employment.  Indeed, "[c]omparatively poor assignments can constitute adverse employment actions." Wright v. N.Y. City Off–Track Betting Corp., No. 05 Civ. 9790, 2008 U.S. Dist. LEXIS 22567, at *10, 2008 WL 762196, at *4 (S.D.N.Y. Mar. 24, 2008)(collecting cases); Neratko v. Frank, 31 F. Supp. 2d 270, 283 (W.D.N.Y. 1998)("Allegations of inferior and less desirable work duties may constitute an adverse employment action.").

The next question is whether the modification in the terms of Besson's employment and the alleged disparities in assignments and wages occurred under circumstances giving rise to an inference of racial discrimination.  Besson's race-based allegations are as follows: (1) between 2006 and 2010, District Business Department Chairperson Kathy Varol spoke to Besson about his students' passing percentages, but did not speak to white teachers about their respective students' passing grades; (2) Varol gave Besson inaccurately low performance evaluations on the basis of his race; (3) Romano assigned Besson to administrative duty despite his performance of administrative duties in enforcing the eligibility policy, whereas Ruisi, who is white, was kept off administrative duty when she enforced the eligibility policy; (4) black teachers were assigned the most populated study halls during the 2009/2010 school year; (5) Besson was paid less as the Boys Soccer Coach than white coaches were paid to coach their respective teams; and (6) Besson's employment was temporarily reduced from full-time to part-time, with Besson being replaced by a white teacher.

As the Court previously found, the increased scrutiny by Varol and the negative performance evaluations are not adverse employment actions that may form an actionable race-based discrimination claim.  With respect to the change in Besson's employment from full-time to part-time, the Court notes Banyon's testimony confirming that nineteen other teachers were excessed at the same time as Besson.  Besson does not come forward with any evidentiary proof

that the District disproportionately targeted black teachers in these layoffs. Further, Young, the person who replaced Besson, had more seniority than did Besson. Viewed this way, the Court finds that Besson has failed to present a triable issue of fact as to whether this adverse employment action occurred under circumstances giving rise to an inference of racial discrimination. Accordingly, the Court grants that part of the Defendants' motion for summary judgment dismissing Besson's claim for racial discrimination based on the temporary change from full-time to part-time.

However, the Court finds that Besson has presented triable issues of fact with respect to whether the alleged disparate administrative assignments and wages occurred under circumstances giving rise to an inference of discrimination. At this stage of the litigation, the Defendants have failed to proffer a legitimate, non-discriminatory reasons for the alleged disparate administrative assignments and wages. Had the Defendants met their burden of producing evidence supporting a nondiscriminatory reason, the burden of proving that such a reason was false and a pretext for discrimination would shift to Besson. Accordingly, the Defendants have not met their intermediate burden of production, and the Court need not proceed with the pretextual analysis. Gaffney v. Dep't of Info. Tech. & Telecommunications, 536 F. Supp. 2d 445, 463 (S.D.N.Y. 2008)(denying summary judgment where "[d]efendants have not asserted a nondiscriminatory reason for failing to hire [plaintiff].").

The question then becomes against which of the Defendants Besson can bring these race discrimination claims. There is evidence that Romano played a role in the assignment of administrative duty and Hunderfund played a role in personnel salaries. Accordingly, the surviving claims against Romano are under Section 1981, Section 1983, and the NYSHRL. The surviving claims against Hunderfund are under Section 1981 and Section 1983. As the Second

Circuit held, Title VII does not provide for individual liability and, therefore, any such claims against the Individual Defendants is dismissed. Spiegel v. Schulmann, 604 F.3d 72, 79 (2d Cir. 2010)("We have, however, determined that the remedial provisions of Title VII . . . do not provide for individual liability.")(citing cases).

As to the District's liability for these adverse employment actions, the Court notes that although employment discrimination claims brought under Title VII and § 1983 are both analyzed under "the burden-shifting framework of Title VII claims," Annis v. County of Westchester, 136 F.3d 239, 245 (2d Cir. 1998), Title VII and § 1983 diverge in that a Title VII claim can be based upon *respondeat superior* liability, whereas a § 1983 claim cannot. See Gierlinger v. New York State Police, 15 F.3d 32, 33 (2d Cir. 1994)("a Title VII sex discrimination claim . . . carries *respondeat superior* liability, and a 42 U.S.C. § 1983 damage claim . . . does not impose *respondeat* liability").  Accordingly, the District can be vicariously liable for Romano and Hunderfund's actions under Title VII and the Court denies the Defendants' motion for summary judgment dismissing Besson's race-based discrimination claim under Title VII against the District.

As to the District's liability under Section 1981 and 1983, again a school district can be held liable under § 1981 or § 1983, but only if its "'policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.'" Back, 365 F.3d at 128 (quoting Monell, 436 U.S. at 691, 98 S. Ct. 2018, 56 L. Ed. 2d 611).  Besson does not allege with factual specificity any failure to train or supervise, or deliberate indifference to the constitutional rights of citizens that a plaintiff must show before a municipality will be held liable on the basis of such a failure. See Jenkins v. City of New York, 478 F .3d 76, 94 (2d Cir. 2007).  However, the Court finds that there is evidence that Romano

acted as a "final policymaker" with respect to the assignments of administrative duty.  Therefore, the Court denies the Defendants' motion for summary judgment dismissing Besson's race-based discrimination claims under Section 1981 and 1983 against the District on the basis of the disparate assignments of administrative duty.

On the other hand, there is no evidence that Hunderfund was a "final policymaker" with respect to personnel salaries.  Therefore, the Court grants the Defendants' motion for summary judgment dismissing Besson's race-based discrimination claims under Section 1981 and 1983 against the District on the basis of the basis of allegedly disparate personnel salaries.

Further, there is no evidence that Brown or Ricca played a role in the allegedly disparate administrative assignments and salaries.  Therefore, the Court finds that Besson's race-based discrimination claims may not proceed against either of them under any of the anti-discrimination statutes and the Court dismisses those causes of action.

3.  Besson's Race-Based Retaliation Claims

As noted above, a plaintiff must show the following to make out a *prima facie* case of unlawful retaliation: (1) the plaintiff engaged in protected activity; (2) the defendant was aware of that activity; (3) the plaintiff suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. Distasio, 157 F.3d at 66.

Here, it is undisputed that Besson engaged in protected activity when he filed a charge of discrimination with the EEOC on December 9, 2011.  He also suffered an adverse employment action only four months later in the form of the temporary reduction of his position.  However, the Court finds that, given the number of teachers excessed at the same time as Besson, no reasonable jury could conclude that Besson's complaint of discrimination to the EEOC had a

causal connection with the temporary partial reduction in Besson's position. Accordingly, the Court grants that part of the Defendants' motion for summary judgment dismissing all of Besson's race-based retaliation claims.

    4.   <u>Besson's First Amendment Retaliation Claim</u>

"To survive a motion for summary judgment on a First Amendment retaliation claim, the plaintiff must present evidence which shows "'[(1)] that the speech at issue was protected, [(2)] that he suffered an adverse employment action, and [(3)] that there was a causal connection between the protected speech and the adverse employment action.'"" <u>Cotarelo v. Vill. of Sleepy Hollow Police Dep't</u>, 460 F.3d 247, 251 (2d Cir. 2006)(quotation omitted). "Further, 'the causal connection must be sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action.'" <u>Id.</u> (quotation omitted). "If a plaintiff makes a sufficient showing of each of these elements, summary judgment is not appropriate unless the defendant establishes as a matter of law that he would have taken the same adverse employment action even absent the protected conduct ." <u>Dillon v. Morano</u>, 497 F.3d 247, 251 (2d Cir. 2007)(citation omitted).

Here, the Defendants do not dispute that Besson engaged in protected speech in publicly criticizing Hunderfund and that Besson suffered an adverse employment action in the form of the temporary change from full-time to part-time. Rather, the Defendants assert that Besson cannot establish a causal connection between his alleged speech and the temporary partial reduction of his position.

Indeed, although Besson spoke out against Hunderfund's appointment in October 2009, his teaching position was not reduced until the 2011-2012 school year. Although the Second Circuit has not "drawn a bright line" setting the outer limits beyond which a temporal proximity

is too attenuated to find the causal relationship, it has held that periods of time shorter than the time period at issue here are insufficient to establish a plaintiff's *prima facie* case. Burkybile v. Bd. of Educ., 411 F.3d 306, 314 (2d Cir. 2005)(finding one-year delay between protected activity and retaliation were insufficient to establish causation when the defendants investigated the plaintiff's concerns). However, the relevance of temporal proximity in a particular First Amendment retaliation case turns on its unique facts and circumstances. See Smith v. Da Ros, No. 09 Civ. 458 (MRK), 2011 WL 839374, *13 (D. Conn. Feb. 25, 2011)(citing Burkybile, 411 F.3d at 314).

Here, the Court takes note of Besson's assertion that the Defendants took the first opportunity to partially eliminate his position, namely, when they were required to make budget cuts. Furthermore, Besson is not merely relying on temporal proximity of the events to establish causation. As discussed above, there is evidence Hunderfund felt insulted and disappointment by Besson's remarks; Brown warned Besson that things "have a way of coming back to bite you" (Besson Dep. at 191); and the email from Hunderfund within a week of the meeting asking teachers not to speak out against the administration.

The fact that the District later restored Besson to a full-time position does not necessarily lead to the conclusion that his partial reduction in position was not retaliatory in the first instance. But see Burkybile, 411 F.3d at 314 (finding that no causal connection was established where over a year passed between the protected activity and the adverse action, and other factors indicating good faith on the part of the defendants were present). Indeed, the Court notes that Besson was reduced again to part time for the 2013-2014 school year. (Besson Affid., at ¶16.)

To be sure, the Defendants come forward with alternative reasons for Besson's partial reduction in position, namely, budget constraints surrounding classes such as business courses

that are not required by New York State. In this regard, Romano and Brown testified that the fact that business courses are not required makes them more vulnerable to cuts than courses that are required. However, the Court declines to find that this defense precludes recovery for Besson on this cause of action, as a matter of law.

Thus, the Court finds that Besson can bring this First Amendment retaliation claim under Section 1983 against the District, Hunderfund, and Brown. However, as there is no indication that Ricca or Romano played a role in the decision to reduce the terms of Besson's employment, this cause of action may not proceed against them. Stated otherwise, the Court denies the Defendants' motion for summary judgment dismissing Besson's First Amendment retaliation claim against the District, Hunderfund, and Brown, and grants that motion as to Ricca and Romano.

5. The Due Process Claims

The Due Process Clause of the Fourteenth Amendment provides that "no state . . . shall deprive any person of life, liberty or property without due process of law." U.S. CONST. amend. XIV, § 1. The United States Supreme Court has held that "the 'right to privacy' is founded in the Fourteenth Amendment's concept of personal liberty[,]" articulated in the Due Process Clause. Whalen v. Roe, 429 U.S. 589, 600 n. 23, 97 S. Ct. 869, 51 L. Ed. 2d 64 (1977) (citing Roe v. Wade, 410 U.S. 113, 152, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973)). The right to privacy has been found to protect two different types of interests. "One is the individual interest in avoiding disclosure of personal matters, and another is interest in making certain kinds of important decisions." Whalen, 429 U.S. at 599–600; C.N. v. Ridgewood Board of Ed., 430 F.3d 159, 178 (3d Cir. 2005).

Foremost among the "important decisions" protected by the Fourteenth Amendment right of privacy is the right of parents regarding the education of their children. "[I]t cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." C.N. v. Ridgewood Board of Ed., 430 F.3d at 182 (quoting Troxel v. Granville, 530 U.S. 57, 66, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000)). However, the right is not absolute and may give way when faced with a legitimate governmental interest. C.N. v. Ridgewood Board of Ed., 430 F.3d at 182–83 (citing cases involving protection of curriculum, school environment, and safety of children).

Courts considering alleged violations of the right to privacy employ a rational basis review. In other words, the inquiry is whether the state action complained of has a "reasonable relationship" to a legitimate state interest. Meyer v. Nebraska, 262 U.S. 390, 403, 43 S. Ct. 625, 67 L. Ed. 1042 (1923)(reversing the conviction of a teacher who violated state law forbidding the instruction of non-English languages to children, finding that the statute was "without reasonable relation to any end within the competency of the state"); Wisconsin v. Yoder, 406 U.S. 205, 233–34, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1971)(recognizing rational basis review as the appropriate standard for parents' right to privacy claim, absent an additional free exercise claim); Pierce v. Society of the Sisters of the Holy Names of Jesus and Mary, 268 U.S. 510, 534–35, 45 S. Ct. 571, 69 L. Ed. 1070 (1925)(affirming an order refusing to enforce state law requiring children to attend public school because it "unreasonably interfere[d] with the liberty of parents and guardians to direct the upbringing and education of children").

In this case, Besson alleges that Hunderfund and Brown – and by extension, the District –

threatened or coerced him regarding where he chose to send his daughter to school. According to Besson, the District denied his application for bus transportation for his daughter during the 2009-2010 school year in retaliation for his decision to send her to a Long Island Lutheran High School. The District maintains that the application for bus transportation was denied as untimely – that is, after April 1st of the preceding school year.

Besson appealed the District's decision to the New York State Education Department, which found in the District's favor. In denying Besson's appeal, the Commissioner of Education noted that the District maintains strict deadlines for the submission of applications for transportation "to enable school districts to budget funds and make necessary arrangements to provide transportation reasonably and economically." (Defs' Ex. CC, at 2.)

The Defendants contend that since the Commissioner of Education already considered the validity of the District's denial of transportation to Besson's daughter, the doctrine of collateral estoppel precludes any further litigation on this issue. Even if collateral estoppel does not apply here, the Court finds, as a matter of law, that the District's stated need to allocate funds and prepare its budge in a timely fashion constitutes a rational basis for its requirement that parents submit their requests for District-funded transportation in a timely manner.

Besson alleges that another student, Nicole Zimmerman, also submitted her transportation application to the District late, but nevertheless was provided with transportation. However, this assertion is belied by the record. In fact, the District's records reflect that Zimmerman's parent submitted her application for District transportation prior to the April 1st deadline. Besson's testimony to the contrary is based on inadmissible hearsay. See Fed. R. Civ. P. 56(e)(1)(stating that an affidavit opposing summary judgment "must be made on personal knowledge, set[ting] out facts that would be admissible in evidence"); Feingold v. New York,

366 F.3d 138, 155 n. 17 (2d Cir. 2004)("In reviewing the district court's grant of summary judgment, . . . we may only consider admissible testimony.") Accordingly, the Court grants that part of the Defendants' motion for summary judgment dismissing Besson's Due Process claim based on the District's denial of transportation for Besson's daughter.

Similarly, the Court finds that Besson has failed to present a triable issue of fact as his allegation that the Defendants violated his constitutional rights with regard to his son's education. As noted above, at some point, Besson learned that his son, a student at one of the District's elementary schools, was one of many students being taken out of his classes for reading lessons as part of a District-wide program. The record indicates that this program was spearheaded by Karen Hietner, the District's reading coordinator at the time, who had the ability to implement such programs without approval of the Superintendent.

The Court finds that Besson fails to cite authority or articulate why this narrow dispute between parent and teacher should be actionable under the Due Process clause of the Fourteenth Amendment. Under these circumstances, the Court grants the Defendants' motion for summary judgment dismissing Besson's Due Process claims.

E. Smith's Claims

    1. Smith's Race-Based Hostile Work Environment Claims

The Court need not recount the relevant legal standards for a hostile work environment claim based on race in violation of Title VII, Section 1981, Section 1983, the Equal Protection Clause of the Fourteenth Amendment, and the NYSHRL. Here, there is no evidence that anyone working for the District ever made comments about Smith's race. Rather, as described above, Smith identifies a number of examples of facially-neutral incidents that he contends contributed to the formation of a hostile work environment directed at him on the basis of race: (1) the denial

of the Middle School Dean Position; (2) Smith's involuntary transfer to the Middle School; (3) alleged discriminatory assignment of Sullivan's math classes when she went on maternity leave for the 2009-2010 academic school year; (4) Ricca held Smith's October 2009 post-observation conference in a hallway during his hall duty; (5) Ricca denied Smith's request to teach two Honors level courses for the 2008-2009 school year, yet allowed white teachers Ruisi, Knudsen, and Prior to teach three higher level courses; (6) the Defendants failed to give Smith any credit for his former students' performance on the Regents examination, and instead credited Ruisi; (67) in the 2009-2010 school year, Ricca and Romano deprived Smith of the use of a "Promethean Board" teaching tool, which was provided to Ruisi, Pryor, and Knudsen; (8) in the 2009-2010 school year, Smith had an old computer in his classroom, while white math teachers Pryor, Knudsen, and Ruisi had new computers.

However, as with Besson, the Court finds that these complaints do not rise to the level of severe or pervasive mistreatment to constitute a hostile work environment on the basis of race. Parekh, 2009 WL 290465, at *5 (E.D.N.Y. Feb. 5, 2009)(granting motion to dismiss hostile work environment claim where "[p]laintiff's complaints concerning unfair disciplinary actions, shift changes, reduction in manpower, wrongfully withheld vacation time, failure to provide him with proper equipment, workplace transfers, failure to promote, and his termination contain no suggestion of hostility or offensiveness"); see also Bowen-Hooks v. City of New York, 10-CV-5947 (MKB), 2014 WL 1330941, at *40 (E.D.N.Y. Mar. 31, 2014). Rather, in the Court's view, these allegations are more appropriately viewed through the lens of a traditional claim of discrimination based on race. Accordingly, the Court grants the Defendants' motion for summary judgment dismissing all of Smith's hostile work environment claims.

2. <u>Smith's Race-Based Discrimination Claims</u>

The Defendants do not dispute that Smith is a member of a protected class; that he was qualified for the Middle School Dean position; and that the Defendants' failure to appoint him to Middle School Dean was an adverse employment action. However, the Defendants dispute that the other instances of discrimination constituted adverse employment actions. Further, the Defendants dispute that Smith was subjected to an adverse employment action under circumstances giving rise to an inference of discrimination.

Smith identifies a number of additional employment actions that he contends constitute "adverse employment actions" – in addition to the failure to appoint him to the Middle School Dean position – for purposes of the anti-discrimination statutes.

With respect to the involuntary transfer claim, Ricca testified that Smith was transferred to the Middle School, in part, because his students performed poorly on one examination question on the 2010 Regents Examination. Ricca also confirmed that she transferred Smith to the Middle School because she thought he would be more effective as a Middle School teacher, and because he did not heed her direction regarding the graphing calculator. Brown testified that Smith was transferred to the Middle School, in part, because he had been insubordinate.

When a plaintiff alleges that a job transfer constitutes an adverse employment action, the plaintiff must show that the new work assignment was "materially less prestigious, materially less suited to his [or her] skills and expertise, or materially less conducive to career advancement." <u>Galabya v. N.Y. City Bd. of Educ.</u>, 202 F.3d 636, 641 (2d Cir. 2000). However, "[c]hanges in assignments or duties that do not 'radical[ly] change' the nature of work are not typically adverse employment actions." <u>Weisbecker v. Sayville Union Free Sch. Dist.</u>, 890 F. Supp. 2d 215, 233 (E.D.N.Y. 2012)(citing <u>Galabya</u>, 202 F.3d at 641). A "'bruised ego,' a

"'demotion without change in pay, benefits, duties, or prestige,'" or "'reassignment to [a] more inconvenient job" are insufficient to constitute a tangible or material adverse employment action. Johnson v. Cnty. of Nassau, 480 F. Supp. 2d 581, 595 (E.D.N.Y. 2007)(citing Ellerth, 524 U.S. at 761, 118 S. Ct. 2257, 141 L. Ed. 2d 633).

Smith's reliance on Kessler v. Westchester County Dept. of Social Services, 461 F.3d 199 (2d Cir. 2006) is misplaced. In that case, the Second Circuit, applying Burlington Northern & Santa Fe Railway Co., v. White, 548 U.S. 53, 126 S. Ct. 2405 (2006), determined that a job reassignment may satisfy the adverse action requirement in a retaliation claim. Kessler, 461 F.3d at 209. However, "[t]he question of what conduct satisfies the adverse action requirement for a retaliation claim involves a different analysis from that applied to a substantive discrimination claim." Ruhling v. Tribune Co., CV 04-2430 (ARL), 2007 WL 28283, at *22 (E.D.N.Y. Jan. 3, 2007). In this regard, in White, the Supreme Court held that a plaintiff asserting a retaliation claim need not show adverse conduct which affects the terms and conditions of employment. Rather, it is sufficient to show conduct which might have dissuaded a reasonable worker from making or supporting a charge of discrimination.

Here, however, Smith does not bring any retaliation claims under Title VII. Thus, in order to withstand the Defendants' motion for summary judgment on the issue of whether Smith's involuntary transfer constituted a materially adverse employment action, Smith must point to a material issue of fact involving "a change in responsibilities so significant as to constitute a setback to the plaintiff's career.'" Whethers v. Nassau Health Care Corp., 06–CV– 4757(DRH), 2013 WL 3423111, at *6 (E.D.N.Y. July 8, 2013)(citing Kessler, 461 F.3d at 206). In this regard, a "'pure lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action.'" Gordon v.

New York City Bd. of Educ., No. 01 Civ. 9265 (SAS), 2003 WL 169800, at *6 (S.D.N.Y. Jan. 23, 2003)(quoting Pimental v. City of New York, No. 00 Civ. 326 (SAS), 2002 WL 977535, at *3 (S.D.N.Y. May 14, 2002); see Galabya v. N.Y. City Bd. of Educ., 202 F.3d 636, 641 (2d Cir. 2000)(holding that the plaintiff's transfer from one special education school to another was not an adverse employment action where there was no evidence that the new assignment was "less prestigious, materially less suited to his skills and expertise, or materially less conducive to career advancement").

In this case, given that Smith did not suffer a loss of salary, benefits, or general responsibilities by virtue of his involuntary transfer to the Middle School, the Court finds, as a matter of law, that the transfer did not constitute a materially adverse employment action. Although Brown testified that Smith was transferred, in part, because he had been insubordinate, it does not follow that the transfer itself reflected a "setback" to his career. In this regard, Smith fails to cite any authority for the proposition that the perception of a transfer as penal in nature, without more, qualifies the transfer as a materially adverse employment action. Therefore, the Court finds that Smith's involuntary transfer from the High School to the Middle School is not independently actionable as an adverse employment action.

On the other hand, the Court finds that Smith suffered adverse employment actions when he was not assigned to, nor asked to assume, any of Sullivan's classes while she was on leave. Ricca apparently asked Connell, Ruisis, Knudsen, and Pryor – all white teachers – to assume Sullivan's classes. The record indicates that, had Smith assumed one of Sullivan's classes, she would have earned additional income. See Mazyck v. Metro. Transp. Auth., 893 F. Supp. 2d 574, 589 (S.D.N.Y. 2012)(finding that the plaintiff who was denied requested overtime had shown adverse employment action); Turley v. ISG Lackawanna, Inc., 803 F. Supp. 2d 217, 235

(W.D.N.Y. 2011)("The denial of overtime may constitute an adverse employment action in some circumstances[.]"); Little v. Nat'l Broad. Co., Inc., 210 F.Supp.2d 330, 379 (S.D.N.Y. 2002)(evidence that the plaintiff "incurred an actual loss in income because of lost overtime and that he was forced to work undesirable shifts with an erratic schedule . . . if true, could prove that [plaintiff] was subject to an adverse employment action").

However, the Court finds, as a matter of law, that the remaining alleged instances of discrimination, including the holding of the October 2009 post-observation conference in the hallway and the deprival of the use of certain teaching tools and technologies – do not constitute "adverse employment actions" for purposes of anti-discrimination lawsuits. Indeed, "[n]ot everything that makes an employee unhappy is an actionable adverse action." Phillips v. Bowen, 278 F.3d 103, 117 (2d Cir. 2002)(citation and quotations marks omitted).

The question then becomes whether material issues of fact exist as to whether Smith's denial of the Middle School Dean position and the disparate assignments occurred under circumstances giving rise to an inference of discrimination. The Court finds that they do.

As to the failure to promote Smith to the Middle School Dean position, it is undisputed that the position – for which Smith applied in 2008 – ultimately went to Nehlsen, who is white. A review of the case law makes clear that it is sufficient to establish this final element of a *prima facie* case of discrimination "where, as here, the plaintiff shows that the position sought went to a person outside his protected class." Velez v. McHugh, 09 CIV. 0925 (GAY), 2011 WL 778693, at *4 (S.D.N.Y. Mar. 2, 2011)(citing Mitchell v. Northern Westchester Hosp., 171 F. Supp. 2d 274, 278 (S.D.N.Y. 2001)). Further buttressing Smith's allegations of race discrimination is the fact that Nehlsen was recommended by Gilhuley, a person outside of Smith's protected class.

Thus, the burden shifts to the Defendants to articulate legitimate, nondiscriminatory reasons for choosing a white individual over Smith. The Defendants satisfy that burden here. In particular, Gilhuley felt that Nehlsen went "above and beyond" in his role as Student Activities Coordinator for the District; Gilhuley knew Nehlsen better, and thought that Nehlsen gave a better interview than did Smith.

The Defendants having articulated nondiscriminatory reasons for the Plaintiff's non-selection for the position of Dean of Students, Smith's race discrimination claim based on that non-selection can survive summary judgment only if he "has raised sufficient evidence upon which a reasonable jury could conclude by a preponderance of the evidence that the decision [not to promote him] was based, at least in part, on the fact that" he is black. Holcomb v. Iona College, 521 F.3d 130, 141 (2d Cir. 2008).

Evidence of pretext includes, among other things, "discriminatory statements or admissions, the mix of the workforce, an atmosphere of discrimination, the employer's general practices, comparative evidence, and statistics." Delville v. Firmenich Inc., 920 F. Supp. 2d 446, 462 (S.D.N.Y. 2013)(citation and quotation marks omitted). Here, Smith proffers statistical evidence indicating that, in Gilhuley's six-year tenure as Principal of the Middle School, he hired only one African-American teacher. This statistic, coupled with the evidence brought forward at the *prima facie* stage, suffices to establish that a reasonable finder of fact could determine that the Defendants' stated reason for the failure to promote him to the position of Dean of Students was a pretext for race discrimination.

Turning to the other materially adverse employment action, again the Court finds that the Defendants have set forth legitimate, nondiscriminatory reasons for assigning Sullivan's classes to other teachers. Smith identifies two teachers, Ruisi and Connell, assigned to classes that he

believes should have been his to teach. However, the Defendants contend Smith was not able to teach the class that Ruisi assumed for Sullivan. (Smith Dep., at 81-82.) They assert that Ruisi was the only mathematics teacher available to teach Sullivan's Geometry lab and class. (Ricca Dep., at 189-190.) This required Ruisi to teach four classes in a row. (Id.) Ricca preferred not to assign teachers to four classes in a row, and thus did not wish to duplicate this practice by assigning Smith to the class that Connell taught. (Id. at 189, 196.)

However, the Court finds that Smith has produced sufficient evidence to establish a triable issue of fact that the Defendants' proffered reasons for assigning Sullivan's classes to other teachers was untrue. Indeed, there is evidence in the record that Smith was in fact available during fifth period, the same period as Sullivan's Geometry lab. (Defs' Exh. R.)

Of course, at the pretext stage, "[t]he factfinder must not only disbelieve the employer, but must believe the plaintiff's explanation of intentional discrimination." Martel v. New England Home Care, Inc., 3:09CV1412 (DJS), 2014 WL 3687738, at *13 (D. Conn. July 22, 2014). In this case, given that several white teachers, including Connell, were given the opportunity to take one of Sullivan's classes, while Smith was not, the Court finds that Smith has established a triable issue of fact as to whether the Defendants discriminated on the basis of race as a result of the disparate scheduling.

The question then becomes against which of the Defendants can Smith bring these race-based discrimination claims. The Court finds that Smith can bring his race-based discrimination claims based on the failure to promote him to the position of Dean of Students under Section 1981 and Section 1983 against Hunderfund, as he was personally involved in that decision. Indeed, he acknowledged that he "accepted" Gilhuley's recommendation as to Nehlsen's hiring. (Hunderfund Dep., at 120.)

Further, the Court finds that Smith can bring his race discrimination claims based on the alleged discriminatory scheduling under Section 1981and Section 1983 against Ricca and as to Romano only under the NYSHRL, but again not under Title VII for any of the Individual Defendants. Smith testified that Romano was responsible for setting the master schedule, and assigning all of the teachers to their respective classes. (Smith Dep., at 224-26.) In this regard, Ricca confirmed that she and Romano spent "hours and hours" setting the class schedules. (Ricca Dep., at 99-103.).

The Court reaches a different conclusion with respect to any race-based discrimination claims against Brown. There is no evidence that Brown was personally involved in the failure to promote Smith to the position of Dean of Students, or setting the master schedule. Although Brown had requested that Smith be transferred to the Middle School, the Court has previously found that this involuntary transfer did not constitute a materially adverse employment action within the meaning of the anti-discrimination statutes. Therefore, the Court grants the Defendants' motion for summary judgment dismissing Smith's race-based discrimination claim against Brown.

With respect to the liability of the District under § 1981 and § 1983, the Court finds that there is no evidence that Gilhuley or Hunderfund acted as a "final policymaker" with respect to the failure to promote Smith to the position of Dean of Students. See Weinstein, 2013 WL 5507153, at *17 (citing Education Law § 1711). Conversely, the Court finds that there is evidence that Ricca and Romano enjoyed "final policymaker" status with respect to the master schedule. Thus, the District can be held liable under § 1981 and § 1983 for race-based discrimination based on Ricca and Romano's handling of the master schedule.

In any event, as previously explained with regard to Besson's race-based discrimination claim, Title VII provides for employer liability under the theory of *respondeat superior*. Consequently, the District can be held liable under Title VII for race-based discrimination – evaluated under the same standards as Section 1981, Section 1983, and the NYSHRL – based both the failure to promote Smith to the position of Dean of Students and the handling of the master schedule.

Further, contrary to the contention of the Defendants, the fact that Gilhuley is not a defendant here does not defeat Smith's attempts to hold the District liable for Gilhuley's actions under the theory of *respondeat superior*. In other contexts, the courts have held that "[v]icarious liability can be imposed against a defendant even though the plaintiff has not also brought suit against those individuals whose tortious actions give rise to that liability. In such a case, any fault which the jury would have allocated to the tortious actor is appropriately allocated to the defendant who is vicariously liable for that actor instead. " Pierrelouis ex rel. Pierrelouis v. Bekritsky, 08 CIV. 123 (KTD), 2012 WL 6700217, at * 5 (S.D.N.Y. Dec. 21, 2012). The Defendants point to no provision of Title VII, or cases interpreting it, that suggests Congress sought to limit Title VII liability to those cases, unlike here, where the employee-wrongdoer is a party to that action. Regardless, to the extent Hunderfund was involved in the decision not to promote Smith and Hunderfund is a party, the District could be liable under Title VII on that basis

3. Smith's Race-Based Retaliation Claims

Smith disclaims reliance on a claim for race retaliation as a result of filing his EEOC charge or for any other complaint of discrimination. Accordingly, the Court dismisses any race-based retaliation claims by Smith.

4.  Smith's First Amendment Retaliation Claims

As noted above, where, as here, a public employee brings a retaliation claim based on the First Amendment, a plaintiff must put forth evidence that demonstrates the following in order to establish a *prima facie* case: "(1) [he] engaged in constitutionally protected speech because [he] spoke as [a] citizen[ ] on a matter of public concern; (2)[he] suffered an adverse employment action; and (3) the speech was a 'motivating factor' in the adverse employment decision." Skehan v. Vill. of Mamaroneck, 465 F.3d 96, 106 (2d Cir. 2006), overruled on other grounds by Appel v. Spiridon, 531 F.3d 138, 140 (2d Cir. 2008).

In this case, the Defendants argue that because Smith never made the statement that the Defendants allegedly believed he had made, there was no protected speech.  In response, Smith relies on the "perception theory" of retaliation used in some Title VII cases in that "a plaintiff states a valid claim for retaliatory discrimination based on culpable behavior by defendants before plaintiff engaged in protected activity to the extent that the behavior was motivated by their belief that plaintiff had already done so." Grosso v. City University of New York, 03-cv-2619 (NRB), 2005 WL 627644, *3 (S.D.N.Y. Mar. 16, 2005); Fogelman v. Mercy Hosp., 282 F.3d 561 (3d Cir. 2002)("We have consistently held that an employer's discharge of an employee for discriminatory reasons amounts to illegal retaliation even if it is based on the employer's mistaken belief that the employee engaged in protected activity."); Johnson v. Napolitano, 686 F. Supp. 2d 32 (D.D.C. 2010)(denying the defendant's motion for summary judgment where the plaintiff asserted retaliation based on mistaken belief that he was engaged in protected activity)).

The Defendants note that these cases do not involve First Amendment retaliation claims and that Smith has cited to no cases using the "perception theory" in that context.  In Hughes v. Anderson, CV09-4042 (ADS)(WDW), 2012 WL 3062155, at *8 (E.D.N.Y. May 31, 2012) report

and recommendation adopted, 09-CV-4042 (ADS)(WDW), 2012 WL 3062140 (E.D.N.Y. July 26, 2012), the Court expressly declined to reach this question. Rather, based on the facts in that case, the court proceeded on the assumption that the allegedly protected speech took place. Here, the Court cannot make that assumption because it is undisputed that the allegedly protected speech did not take place.

The Court agrees with those courts outside this circuit that have held "there can be no First Amendment claim when an employee is falsely accused of making statements uttered by someone else." Wasson v. Sonoma Cnty. Junior Coll., 203 F.3d 659, 663 (9th Cir. 2000); accord Fogarty v. Boles, 121 F.3d 886, 891 (3rd Cir. 1997)("[T]he absence of speech-in fact, its explicit disclaimer by plaintiff-is fatal to the plaintiff's claim."); Jones v. Collins, 132 F.3d 1048 (5th Cir. 1998)(employment action taken on the mistaken belief that the employee had spoken negatively regarding a matter was not a First Amendment violation as "[a] free speech claim depends on speech, and there was none in this case.")(internal quotations omitted). Therefore, the Court grants the Defendants' motion for summary judgment dismissing Smith's First Amendment retaliation claims against the District and the Individual Defendants.

In any event, with respect to the Individual Defendants, even assuming that Smith engaged in protected speech, Smith's interest in the speech outweighed the District's interest in effective administration; and that Smith would not have been involuntarily transferred to the High School but for his protected speech, the Court would nevertheless find that the Individual Defendants are entitled to qualified immunity.

Government officials performing discretionary functions are entitled to qualified immunity from liability for civil damages to the extent that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have

known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). Officials lose the protection of qualified immunity if it appears that (1) they violated a statutory or constitutional right of the plaintiff, and (2) the right was "clearly established" at the time of the acts complained so that an objectively reasonable official in that position would have known of the right.

The immunity shield operates at two levels: (1) the particular right must be clearly established in the law; and (2) the manner in which this right applies to the actions of the official must also be apparent. "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." <u>Maciariello v. Sumner</u>, 973 F.2d 295, 298 (4th Cir. 1992).

Here, since neither the Supreme Court of the United States nor the Second Circuit has ruled on whether an individual can bring a First Amendment retaliation claim for "perceived speech," Smith did not have a "clearly established" right of which the Defendants would have known. <u>See</u> <u>Anderson v. Recore</u>, 317 F.3d 194, 197 (2d Cir. 2003)(explaining that in evaluating whether a right is clearly established, the Court must look to the relevant decisions of the Supreme Court and Second Circuit). Accordingly, the Court grants the Defendants' motion for summary judgment dismissing Smith's First Amendment retaliation claim.

F. <u>Severance</u>

Fed. R. Civ. P. 20(a) permits the joinder of multiple plaintiffs if: "(A) they assert any right to relief jointly, severally, or in the alternative with respect, to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all plaintiffs will arise in the action." Fed. R. Civ. P. 20(a)(1). If a court concludes that plaintiffs have been improperly joined under Rule 20, it has broad discretion under Rule 21 to sever parties from the action. <u>See</u> Fed. R. Civ. P. 21 ("On motion or on its own,

the court may at any time, on just terms, add or drop a party.  The court may also sever any claim

against a party."); <u>State of New York v. Hendrickson Bros., Inc.</u>, 840 F.2d 1065, 1082 (2d Cir.

1988)("The decision whether to grant a severance motion is committed to the sound discretion of

the trial court."); <u>In re Facebook, Inc.</u>, No. 12–2389, 2013 WL 4399215, at *2 (S.D.N.Y. Aug.

13, 2013)(same).  "The decision whether to grant a severa[nce] motion is committed to the sound

discretion of the trial court." <u>Hendrickson Bros., Inc.</u>, 840 F.2d at 1082.

The courts weigh several factors in a severance analysis including:

(1) whether the claims arise out of the same transaction or occurrence;
(2) whether the claims present some common questions of law or fact;
(3) whether settlement of the claims or judicial economy would be facilitated;
(4) whether prejudice would be avoided if severance were granted; and
(5) whether different witnesses and documentary proof are required for the
     separate claims.

<u>Morris v. Northrop Grumman Corp.</u>, 580 (E.D.N.Y. 1999)(ADS).  "Severance requires the

presence of only one of these conditions." <u>Cestone v. Gen. Cigar Holdings, Inc.</u>, 00CIV3686

RCCDF, 2002 WL 424654, at *2 (S.D.N.Y. Mar. 18, 2002)(citations and quotation marks

omitted).

Further, Rule 42(b) provides, in pertinent part, that "the Court, in furtherance of

convenience or to avoid prejudice, or when separate trials will be conducive to expedition and

economy, may order a separate trial of any claim . . . ." Fed. R. Civ. P. 42(b).  "[C]ourts have

broad discretion in deciding whether to grant separate trials." <u>Todaro v. Siegel Fenchel & Peddy,

P.C.</u>, 04-CV-2939 (JS)(WDW), 2008 WL 682596, at *2 (E.D.N.Y. Mar. 3, 2008).

The surviving claims brought by Benedith, an Assistant Principal of the High School,

allege a hostile work environment, plus unlawful denial of tenure and termination from her

position on the basis of race.  The surviving claims brought by Besson, a teacher in the High

School, allege unlawful disparate assignments and wages on the basis of race, plus First

Amendment retaliation for speaking out against Hunderfund at the public board meeting. Finally, the surviving claims brought by Smith, a teacher in the Middle School, allege an unlawful failure to promote and disparate scheduling on the basis of race.

Although each of the Plaintiffs' were at all relevant times employees of the District; bring race-based claims against the District; and are represented by the same attorney, it is unclear if their respective claims "arise out of the same transaction or occurrence."

On the one hand, each plaintiff had separate dealings with the respective Defendants, and the claims alleged by each Plaintiff arise out of separate incidents. See Morris, 37 F. Supp. 2d at 581 (granting separate trials and noting "there is no evidence that the [plaintiffs'] claims are related in any respect other than the fact that they both worked for the same company and they are both based on race discrimination"). In this regard, the facts surrounding the various claims do "not substantially overlap." Alessi v. Monroe Cnty., 07-CV-6163 (MAT), 2008 WL 398509, at *2 (W.D.N.Y. Feb. 12, 2008).

On the other hand, "the same transaction or occurrence factor routinely has been found to exist where employee plaintiffs with varying factual circumstances allege the common denominator of a policy or practice of discrimination." Gerace v. Cliffstar Corp., 05-CV-65S (WMS), 2009 WL 5042621, at *2 (W.D.N.Y. Dec. 15, 2009); Todaro v. Siegel Fenchel & Peddy, P.C., No. 04–CV2939 (JS)(WDW), 2008 U.S. Dist. LEXIS 17894, at *6-7, 2008 WL 682596 (E.D.N.Y. Mar. 3, 2008)(the plaintiffs employed in different titles, who reported to different individuals, and experienced different adverse actions alleged policy of discrimination against females generally, and more specifically, pregnant females); Puricelli v. CNA Ins. Co., 185 F.R.D. 139, 143 (N.D.N.Y. 1999)(the plaintiffs in different job titles who were terminated under different circumstances alleged pattern of discrimination based on age); Fong v. Rego Park

Nursing Home, No. 95–CV–4445 (SJ), 1996 U.S. Dist. LEXIS 22289, 1996 WL 468660 (E.D.N.Y. Aug. 7, 1996)(the plaintiffs terminated by different defendants, under different circumstances, and at different times alleged differential disciplinary treatment based on age and ethnicity); Blesedell v. Mobil Oil Co., 708 F. Supp. 1408, 1421 (S.D.N.Y. 1989)(the plaintiffs who made individualized claims of sexual harassment alleged they were each injured by the same general policy of permitting discrimination against women).

That said, the Court concludes that "[s]evering the [three P]laintiffs' claims from one another would not prejudice any party, and indeed, would reduce the potential for prejudice that could arise from confusion of the factual issues and legal claims made by the plaintiffs." Allessi, 2008 WL 398509, at *2. The Court notes that Besson alleges a First Amendment retaliation claim that has no relation, either factually or legally, to the surviving claims initiated by Benedith and Smith. Further, unlike Besson and Smith, Benedith does not bring claims under Title VII and therefore he cannot hold the District liable on a theory of *respondeat superior*. Finally, "although many of the same witnesses are likely to be called in each case, that factor alone does not outweigh the several reasons for granting the defendants' motion to sever." Id.; see also Tardd v. Brookhaven Nat. Lab., No. 04 CV 3262 (ADS), 2007 WL 1423642, at *11 (E.D.N.Y. May 8, 2007).

The Plaintiffs give short shrift to the Defendants' alternative motion for severance and separate trials, limiting their objection to a single footnote – which are explicitly prohibited under this Court's Individual Rules, see Individual Motion Practices II.A ("Footnotes are not permitted in any papers, including letters, filed with the Court.") – stating conclusory assertions about judicial economy. Regardless, in light of the complexity of this case and the probability of confusion as to the conduct asserted against the respective defendants – as evidenced by the

necessity for separate memoranda of law for purposes of summary judgment – and the varying legal standards that a jury would be asked to consider, the Court finds severance to be appropriate.

## III.  CONCLUSIONS

In sum, the Court grants in part and denies in part the Defendants' motions for summary judgment.

As to Benedith, the Court denies the Defendants' motions for summary judgment as to (1) the claims for a hostile work environment on the basis of  race in violation of § 1981, § 1983, the Equal Protection clause, and the NYSHRL against Brown; (2) the claims for a hostile work environment on the basis of race in violation of § 1981, § 1983, and the Equal Protection Clause against the District; (3) the claims for race discrimination based on Smith's denial of tenure and termination of employment under § 1981, § 1983, and the Equal Protection clause against Hunderfund.

As to Besson, the Court denies the Defendants' motions for summary judgment as to (1) the claims for First Amendment retaliation under § 1983 against Brown; (2) the claims for race discrimination under § 1981, § 1983, and the Equal Protection clause against Hunderfund; (3) the claims for First Amendment retaliation under § 1983 against Hunderfund; (4) the claims for race discrimination under § 1981, § 1983, and the Equal Protection, and the NYSHRL against Romano; (5) the claims for race discrimination based under § 1981, § 1983, and the Equal Protection clause against the District; and (6) the claims for First Amendment retaliation under § 1983 against the District.

As to Smith, the Court denies the Defendants' motions for summary judgment as to (1) the claims for race discrimination under § 1981, § 1983, and the Equal Protection clause against

Hunderfund; (2) the claims for race discrimination under § 1981, § 1983, and the Equal Protection clause against Ricca; (3) the claims for race discrimination under § 1981, § 1983, the Equal Protection clause, and the NYSHRL against Romano; and (4) the claims for race discrimination under § 1981, § 1983, and the Equal Protection clause against the District.

The Court also grants that part of the motions to sever and/or for separate trials pursuant to Rules 20 and 42 of the Federal Rules of Civil Procedure, and the Court orders that the Plaintiffs will receive separate trials against those Defendants for which causes of action survive. The first named Plaintiff, Betsy Benedith, shall proceed under the current docket number, and each of the other plaintiffs is granted until September 15, 2014 to file a separate action – with a new complaint consistent with this order on the Defendants' motions for summary judgment – to be assigned to this Court. In the event one or both of the other plaintiffs file a separate action, the Clerk of the Court is directed to link the new docket number back to the current docket number for viewing older docket entries in the case.

**SO ORDERED.**

Dated: Central Islip, New York
August 15, 2014

_____*Arthur D. Spatt*_____
    ARTHUR D. SPATT
United States District Judge